This is an executors' suit for construction of a will. Samuel G. Croft, the testator, died July 28th, 1941, leaving an estate valued at more than $5,000,000. Taxes and specific bequests have been paid and $2,372,651.30 remains to be distributed under the residuary clause of the will. It reads: *Page 281 
"Thirteenth. All the balance of my estate, I bequeath unto my three nephews, Harold Sidney Bottomley, Estate of GordonFrederick Bottomley and Howland William Bottomley, in the following proportions; Harold Sidney Bottomley to have four-tenths; Estate of Gordon Frederick Bottomley and Howland William Bottomley, three-tenths each, with the hope that these men will always act with credit throughout their business careers in continuing the business established by my father and will prove their appreciation of the chance that was given them." (Italicized to indicate words, the interpretation of which is questioned.)
The testator, at the time of his death, was the senior partner of Howland Croft Sons Co., a partnership engaged in the manufacture of worsted yarns in the City of Camden. That firm was founded in 1880 by testator's father, Howland Croft. In 1889 the partnership consisted of Howland Croft and his three sons, John W. Croft, George H. Croft and Samuel G. Croft. George H. Croft retired in December, 1902, and John W. Croft in December, 1916; the testator continued to be associated with his father until his father's death.
Testator was a bachelor. He was sixty-seven years of age at the time of his death. Harold, Gordon and Howland Bottomley, named in the residuary clause of his will, are the sons of his sister, Miranda C. Bottomley. They were also his proteges; he dictated the place and the character of their education, had them each serve an apprenticeship in his mill, and as each attained his majority gave him $10,000 and the opportunity to purchase a junior partnership; Harold was specially trained to manage the mill, Gordon to be the outside business representative and salesman for the firm, and Howland to purchase raw materials; Harold became a junior partner August 3d 1908; Gordon, December 17th, 1909; and Howland, January 17th, 1912; at the suggestion of the testator, each made a trip around the world before assuming the position for which he had been educated and trained; each then became an assistant to the testator. When the testator died in 1941 Harold and Howland succeeded to the control and management of the business; Gordon had died, an active partner in the business, November 30th, 1934. A fourth nephew of the testator, the defendant John W. Croft, Jr., was given an opportunity to become *Page 282 
interested in the business; he served part of an apprenticeship, but quit to engage in the real estate business.
Gordon F. Bottomley was survived by his wife, the defendant Constance S. Bottomley, and by seven minor children. The youngest child was only a few weeks old at the time of his father's death. Gordon devised his home to his wife and created a testamentary trust for her benefit and that of his seven minor children. He directed that all of the income from his estate be paid to his widow until the first of his children attained the age of twenty-one years, and that thereafter the income from one-third of his estate be paid to her for life. At her death he directed that his estate be divided among his children. Children, he provided, were to share and share alike, the shares of the sons to be paid to them as they successively attained the age of twenty-one years and the shares of the daughters to be held for them, they to receive the interest thereon for life and to have power of disposal thereof by will.
Gordon appointed his uncle, the testator, and his brothers Harold and Howland, his executors and trustees. They duly qualified and took over the administration of his estate. The testator was the most active in the discharge of their duties and he exhibited a deep personal interest in the welfare of Gordon's family and the future of Gordon's sons. Gordon had said in his will: "It is my wish and direction that any of my sons who may so desire shall have the opportunity to enter the business of Howland Croft Sons Company, Camden, New Jersey." When Gordon's eldest child, Gordon, Junior, graduated from high school he entered the business college in Philadelphia which had been attended by the testator and by his father and his uncles. He then became an apprentice in the mill. He and his brother James were working there when they entered the armed forces of the United States for the present war.
The partnership founded by Howland Croft has existed for more than sixty years by oral understanding. When Gordon died, a partnership policy, previously adopted, was followed: The value of Gordon's interest was fixed as its book value on the date of his death, and the obligation to pay over *Page 283 
to Gordon's executors the amount so determined was recognized; in lieu of the payment of further earnings upon Gordon's capital interest, four per cent. interest per annum was allowed, to be paid until satisfaction of the debt. Almost immediately after the death of Gordon, the testator directed Mr. Porter to "draw those checks and pay the interest monthly to the Estate of Gordon F. Bottomley." One-twelfth of the annual interest was then paid each month to Gordon's widow; partnership checks were made payable to "Estate of Gordon F. Bottomley" or "Estate of G.F. Bottomley;" they were received by the executors and deposited in their executors' account, and the money was then paid to Gordon's widow in accordance with the terms of Gordon's will.
The testator visited Gordon's family "frequently" after Gordon's death. Each Christmas, until his death, the testator made a gift to Gordon's widow of $1,000; he sent two of Gordon's sons to Maine on vacation and paid their expenses; he presented bank stock to each of Gordon's seven children and he made additional gifts to at least two of the children when they were christened. Until the testator's death he kept a copy of Gordon's will in his possession.
In December, 1936, testator determined that the executors' account in the Gordon F. Bottomley estate should be closed and that the trustees should take over. Accordingly, as of January 2d 1937, an account was rendered by the executors and releases were executed by them as trustees; the testator signed and took affidavit to the account, and signed the release; the papers were entitled "In the Matter of the Estate of Gordon Frederick Bottomley." Following the transfer of assets, testator continued his supervision of the trust: March 1st, 1937, he decided that the partnership obligation to Gordon's estate should be liquidated and personally selected from the partnership folio the securities which were delivered to the trustees. When testator executed his last will and testament he had full knowledge of the provisions of Gordon's will and was an active trustee in the administration of the trust therein created.
Nowhere else in the testator's will, except in the thirteenth paragraph, was any provision made for Harold and Howland *Page 284 
Bottomley, the testator's nephews and close business associates, and nowhere else, unless in that paragraph, was any special provision made for the children of the testator's deceased nephew and partner, Gordon F. Bottomley. The first twelve paragraphs of the will concern specific bequests: To his sister Miranda C. Bottomley, the testator gave $100,000; to his brother George H. Croft, the income on $100,000 for life; to Lewis S. Porter, a junior partner, but unrelated to testator, $50,000; to his nephew John W. Croft, Jr., who had quit the business, $30,000; to his nieces Anne and Evelyn Croft, $20,000 each. By a general gift, the testator bequeathed $340,000, giving $20,000 to each of his grandnieces and grandnephews, without naming them, to be paid to them as they respectively attained twenty-five years of age. To distant relatives, old employees and friends, the testator made devises of certain real estate, and bequests of cash totaling $242,000; and to eight named charities he bequeathed sums aggregating $120,000. He directed that his executors cancel all debts due to him and that all legacies be paid "net, if possible" to beneficiaries.
The trust of $340,000 created by the testator in favor of his grandnieces and grandnephews has been set up, and one grandnephew, Harold Sidney Bottomley, Jr., has been paid his share, $20,000. A grandniece, Mary Christine McCloskey, has passed her twenty-fifth birthday but has not been paid because she is one of the defendants questioning the executors' interpretation of clause thirteen; the executors have asked the advice of the court as to possible forfeiture. A partial distribution of the residue of decedent's estate has also been made. This was done before the principal question submitted to the court in this proceeding was agitated. Two payments were made: $200,000 was distributed in April, 1942, and $50,000 in December, 1942, four-tenths to Harold S. Bottomley, three-tenths to Howland W. Bottomley, and three-tenths to the trustees of Gordon F. Bottomley, deceased.
Two questions are presented: (1) How should the words "Estate of Gordon Frederick Bottomley," as twice employed by testator in the thirteenth clause of his will, be construed? (2) Is Mary Christine McCloskey precluded from taking her *Page 285 
bequest as a grandniece because of the fact that she has appeared by counsel and challenges the executors' interpretation of clause thirteen?
Harold S. Bottomley and Lewis S. Porter, as executors of the testator's estate, take the position that the words "Estate of Gordon Frederick Bottomley" as used by the testator, expressed his intention to pass three-tenths of his residuary estate to the trustees of Gordon's estate for administration under the terms of the trust created by Gordon's will. Harold and Howland Bottomley, as trustees of Gordon, Gordon's widow and his children contend for this interpretation of the will, and Harold and Howland Bottomley, as the executors and trustees of Miranda C. Bottomley agree that the will should be so construed. Harold and Howland take this position notwithstanding the fact that they will, as individuals, participate in the division of approximately three-quarters of a million dollars if this bequest is held void. In the event of a declaration of partial intestacy, those who would participate with Harold and Howland Bottomley in such division are the defendants John W. Croft, Jr., Anne Croft, Evelyn Croft and Mary Christine McCloskey. These defendants are descendants of John W. Croft, testator's brother. They contend that the bequest to "Estate of Gordon Frederick Bottomley" is void because these words do not, as they say, describe a legal entity capable of taking property, and do create a patent ambiguity. The ambiguity being patent, they argue, the court is restricted to consideration of the words quoted, and no extrinsic evidence in aid of their construction is admissible.
Even those who contend for partial intestacy conceded, on the argument, that testator, in employing the words "Estate of Gordon Frederick Bottomley," intended to express his wish that the family of his nephew Gordon benefit to the extent of three-tenths of his residuary estate. Did the testator then, in employing this expression, use words which must be so construed by this court as to defeat his intent and result in partial intestacy? Those who argue the affirmative cite and rely upon two California decisions, In re Glass Estate (Sup. Court, 1913), 164 Cal. 765; 130 Pac. Rep. *Page 286 868, and In re Davis Estate (District Court of Appeals,1936), 59 Pac. Rep. 2d 547. In the Glass Case the testamentary words to be construed were "father Glass estate," and in the Davis Case "all my stock and real estate to be sold and devised to all of the estate." The Supreme Court, in theGlass Case, held that the quoted words were not descriptive of a person or entity which could take under the will. This finding was, however, weakened by the citation, as authorities, of sections 1276 and 1313 of the Civil Code of California; section 1276 merely declares the formalities requisite to the execution of a valid will, and section 1313 concerns only devises or bequests to charitable or benevolent societies or corporations. In deciding the Davis Case, the District Court of Appeals followed the decision in the Glass Case, but cited as its impelling statutory authority section 27 of the Probate Code of California. Section 27 became effective after the decision in theGlass Case but is more pertinent to the question determined than sections 1276 and 1313 of the Civil Code; it limits testamentary dispositions to natural persons capable by law of taking property and to certain corporations. It is the law, of course, which gives to a testator the power to make a will, and the exercise of that privilege must be submitted to the law.Holcomb v. Executors of Holcomb (Court of Chancery),11 N.J. Eq. 476, 485.
To further support the argument made for partial intestacy, these additional cases are cited: In re Doyle's Estate (Sup.Ct., Mont. 1938), 80 Pac. Rep. 2d 374; Simmons v.Spratt (Sup. Ct., 1884), 20 Fla. 495, and (1890),26 Fla. 449; Gardner v. Anderson (Kan. Sup. Ct., 1923),227 Pac. Rep. 743; Martin v. Hale (Tenn. Sup. Ct., 1934),71 S.W. Rep. 2d 211; Morrison v. Hazzard (Tex. Civ. App.,1905), 88 S.W. Rep. 385; affirmed, 92 S.W. Rep. 33. In theDoyle Case, the court cited and followed the decision in theGlass Case but suggested that if the testatrix' intention could have been ascertained its decision might have been different. It declared its inability, after a consideration of the will "and such extrinsic facts" as appeared in a written stipulation, to ascertain who the testatrix intended should *Page 287 
receive a bequest to "Estate of John Doyle." The Simmons Case
involved a conveyance to "Estate of Daniel W. Hart;" the court held the description of the grantee to be too vague and uncertain, commenting, "what is intended is nowhere defined and the executors connect nothing with their description by way of reference to enable identifying evidence to come in." In theGardner Case the will provided that, upon the happening of a certain event, testator's property "revert to the Gardner Estate." The court held that "as a bequest" it was void because "an estate could not be a devisee or legatee;" a strong dissenting opinion was filed by three members of the court. In the Martin Case the will provided "all of aforesaid property is to revert to my estate." Certain heirs contended that a fee was devised through this provision. The court held otherwise saying "the essential of identity in designation of the devisee is wanting." Morrison v. Hazzard is not in point. (Italics mine.)
After careful consideration of the opinions in the cases just discussed, I am not persuaded that they should be accepted as binding precedents in the instant case. In New Jersey the intention of the testator is the law of his will, and as Vice-Chancellor Stevenson said in Hewitt v. Green, 77 N.J. Eq. 345,353; 77 Atl. Rep. 25, caution must be used `in attributing to the phraseology which the testator has employed the technical meaning which has been fastened upon the same phraseology in the decisions of courts in other cases." The Vice-Chancellor citedKingsbury v. Walter (1901), A.C. 187, 188, where Lord-Chancellor Halsbury, emphasizing the point, expressed a strong disinclination to lay down abstract propositions with respect to the meaning of testamentary terms "which are likely (do what you will in order to apply your observations to the particular will) to be quoted afterwards as applicable to a different will, made by a different person, using different language, under totally different circumstances."
The technical construction put upon the words "estate of" by the courts of California has not been universally accepted. In 1930 the Supreme Court of Massachusetts decided the case ofLeary, Trustee, v. Liberty Trust Co., Trustee, 272 Mass. *Page 288 1; 171 N.E. Rep. 828. The bequest was: "to my said brother James if he be then living and in event of his death to his, said James' estate." James died before the testator. The court reviewed the decisions in point, including the Glass Case, but determined that the words "James Estate" should be so interpreted as to effectuate the intention of the testator. The court concluded its opinion thus:
"The remainder passed under the will of Michael, but it was his intention that this remainder should be taken by those whom James should designate, not in the sense of incorporating the will of James into his (Michael's) will by reference, but by making the remainder a part of James' estate, James having the right to dispose of the remainder as a part of his estate as he wished."
In Arnett v. Fairmount Trust Co., 70 W. Va. Rep. 296;73 S.E. Rep. 930, the Supreme Court of West Virginia construed these words: "If any money left after the distribution let it be return to the estate of C.W. Arnett." C.W. Arnett was deceased when the will containing these words was executed. The court refused to declare the provision void for uncertainty, saying:
"It is evident from the language used, that to sustain the clause as a valid disposition of property, we must be able, under recognized rules of construction, to interpret the words `estate of C.W. Arnett,' as definitely referring to the executor of the will of C.W. Arnett, deceased, and also to interpolate after them these words, or their equivalent, `to be taken, held and administered as a part of his estate and according to the terms and provisions of his will.' If the intention of the testator be clear, well recognized rules of construction permit courts to supply and interpolate words, and even to fix the sense of ambiguous words.
"We are of the opinion, therefore, taking the will of the testatrix by its four corners, that the words of the residuary clause, `let it be return to the estate of C.W. Arnett,' means to the executor of the will of said C.W. Arnett, deceased, to go and be distributed as, by the terms of his will, his estate is directed to be distributed, to his legatees. We think the principles of the authorities cited justify this conclusion." *Page 289 
In its opinion the court commented upon the fact that the testator was familiar with the will of C.W. Arnett. The opposing theories touching the construction of bequests to estates were thoroughly analyzed. A dissenting opinion was filed, but the reasoning of the majority opinion is impressive.
In Reid v. Neal, 182 N.C. 192; 108 S.E. Rep. 769, the Supreme Court of North Carolina passed upon the construction to be given these words in a will, "at her death, I give it to her bodily heirs, if any, and if none, to return to my estate." The court, inter alia, said:
"It cannot be successfully urged that the word `estate' makes the last limitation void for uncertainty. This word has more than one meaning, and is susceptible of more than one construction. * * * Its legal signification must be ascertained from the context, or an examination of all the provisions of the instrument in which it appears."
A like conclusion was reached by the Surrogate's Court of New York County, in the case of In re Billman Estate, 24 N.Y.S.
2d 43.
Counsel have not, nor have I, found any case in the New Jersey reports touching upon the exact legal point here under discussion. Our courts have, however, construed the word "estate" in the light of the users' intent. In Coghlan v. ImprovedOrder of Heptasophs (Supreme Court), 86 N.J. Law 41;91 Atl. Rep. 132, suit was brought against a fraternal beneficial association by the executor of a deceased member upon a certificate providing for the payment of benefits to the member's "estate." Our Supreme Court held that the executor was entitled to the proceeds of the certificate. Mr. Justice Trenchard remarked:
"The parties undoubtedly meant that the money should be paid to the insured's executor or administrator, to be administered as a part of the property which the insured might have at his death."
In Cunningham v. United States Trust Co., 124 N.J. Eq. 535;3 Atl. Rep. 2d 133, Vice-Chancellor Lewis construed the word "estate" as used in a trust deed. The direction was to pay the entire principal of the fund to the settlor's "estate." Vice-Chancellor Lewis said: *Page 290 
"In my opinion the word `estate' is used in the ordinary or vernacular meaning, and in the sense in which it is used in the trust deed it means that the corpus of the estate is to be considered part of the property remaining in her ownership at the time of her death and as such to come into the possession, like all her other property, of her executor."
In Metropolitan Life Insurance Co. v. Poliakoff, 123 N.J. Eq. 524; 198 Atl. Rep. 852, Vice-Chancellor Bigelow was called on to construe the word "estate" in deciding an interpleader suit. A certificate issued under a group insurance policy named the "estate" of the insured the beneficiary. The Vice-Chancellor held that the money due thereunder was payable to the executor or administrator.
In Estate of Robert Gemmell, 123 N.J. Eq. 315;197 Atl. Rep. 428, Vice-Ordinary Buchanan declared (at p. 317 of the official report), that a policy of insurance payable to the "estate of the insured, with a right reserved to change the beneficiary, would have been payable, had the insured not changed the beneficiary, "* * * to his executor or administrator, and would have passed under his will or the laws of intestate succession." Vice-Ordinary Buchanan also construed the word "estate" as used in a will in the matter of the Estate of Dora Everson, deceased. The opinion of the Vice-Ordinary is not reported; the file in the New Jersey Prerogative Court is No. 5427. The will directed that the indebtedness due the testatrix from "the estate" of her deceased son "be released and discharged." The Vice-Ordinary held that by necessary implication, the testamentary clause constituted a release to the executor and effected a transfer of the chose in action to the estate designated just as efficiently as if the transfer were made by a technical assignment.
"The court must do everything in its power to ascertain the testator's intentions and to see that they are carried out, if possible." Second National, c., v. Borden (Court ofChancery), 113 N.J. Eq. 378, 381; 167 Atl. Rep. 224; Johnson
v. Bowen (Court of Chancery), 85 N.J. Eq. 76;95 Atl. Rep. 370. When the testator's intention is ascertained, if it is not violative of any rule of law, it will prevail over *Page 291 
technical rules and words in their technical or even ordinary meaning. Kent v. Armstrong (Court of Errors and Appeals),6 N.J. Eq. 637; Redmond v. New Jersey Historical Society
(Court of Errors and Appeals), 132 N.J. Eq. 464; 28 Atl. Rep.
2d 189; modifying 129 N.J. Eq. 57; 18 Atl. Rep. 2d275; Holbrook v. Greene (Court of Chancery), 125 N.J. Eq. 337,339; 5 Atl. Rep. 2d 730, 731.
The power of this court to effectuate the manifest intent of a testator by inserting omitted words, by altering the collocation of sentences, or even by reading his will directly contrary to its primary signification is well established. This power, when necessary, is exercised to prevent the intention of the testator from being defeated by a mistaken use of language. The question presented is simply this: Will the court execute the clear intent of the testator not fully or clearly expressed in a will, or will it by a strict technical adherence to the form of words and their literal meaning suffer the intention of the testator to be defeated? Scarborough v. Scarborough (Court of Chancery),134 N.J. Eq. 201; Van Houten v. Pennington (Court of Errorsand Appeals), 8 N.J. Eq. 745, 749. In the exercise of this power and the discharge of its responsibility, this court has frequently construed technical legal words contrary to their technical meaning. Some of those cases are: Den ex dem.Blackwell v. Blackwell (Supreme Court), 15 N.J. Law 386;Stokes v. Tilly (Court of Chancery), 9 N.J. Eq. 130;Aitken v. Sharp (Court of Chancery), 93 N.J. Eq. 336, 346;115 Atl. Rep. 912; Campbell v. Cole (Court of Chancery),71 N.J. Eq. 327; 64 Atl. Rep. 461; affirmed, 73 N.J. Eq. 384;67 Atl. Rep. 1052; First National Bank v. Levy (Court ofChancery), 123 N.J. Eq. 21; 195 Atl. Rep. 820, application to amend decree denied, 126 N.J. Eq. 493; 9 Atl. Rep. 2d 789;affirmed, 130 N.J. Eq. 220; 21 Atl. Rep. 2d 788.
One who reads clause thirteen is immediately conscious of inconsistency and ambiguity. Testator there expresses the hope that "these men will always act with credit throughout their business careers" "and will prove their appreciation of the chance that was given them." Gordon was one *Page 292 
of "these men," but he had died before the will was executed and could not further prove his appreciation of the opportunity testator had given him, or continue the business established by testator's father. If Gordon had been alive when paragraph thirteen was adopted by the testator, the words "Estate of," which produced inconsistency and created uncertainty, would not have been employed. The remaining words are entirely consistent and the intent expressed is certain. Who then chose the words "Estate of" in drafting the will? For the defendants John W. Croft, Jr., Anne Croft, Evelyn Croft and Mary Christine McCloskey it is argued that the answer to this question may not be ascertained by the court. This is not the law.
In determining whether or not testamentary words were used in their technical sense, a court should consider whether the draftsman of the will was or was not familiar with the technical meaning of those words, construing words in their technical sense where it appears that the draftsman knew what that meaning was, and not placing too great emphasis on the precise meaning of the language used where the will is the product of one not familiar with legal terms, or not trained in their use. 69 C.J., Wills,¶¶ 1129 and 1130. The courts of this state have frequently recognized the propriety and legality of an inquiry as to the identity of the draftsman of a will and as to his knowledge or lack of knowledge with respect to technical words or phrases employed, and have construed such words and phrases in the light of information so elicited. Vice-Chancellor Griffin, in the oft-cited case of Wunderlich v. Bleyle, 96 N.J. Eq. 135;125 Atl. Rep. 386, declared that in the construction of a technical legal word or phrase "regard must be had to the knowledge of the law possessed by the scrivener." How can the court follow this admonition unless it may receive and utilize extrinsic evidence?
Counsel have not, nor have I, located a reported case where the question of admissibility of evidence to identify the draftsman of a will and to disclose his knowledge of the technical words or phrases utilized was directly raised. The reports are, however, replete with decisions where the construction *Page 293 
given to the particular technical word or legal term under consideration was influenced by the knowledge and experience or lack of knowledge and experience assigned to the scrivener. In New Jersey, courts have presumed, from the language employed, that the will was drawn by one experienced or inexperienced in the use of technical words, and have interpreted the words used in accordance with such presumption; have interpreted technical words according to their technical meaning where the draftsman of the will was known to the court to be a learned and experienced lawyer; and have based their construction of technical words and phrases upon the circumstance, known or assumed, that the will was drafted by a testator unlearned in the law. Hewitt v.Green, supra; Aitken v. Sharp, supra; Wunderlich v. Bleyle,supra; Lippincott v. Purtell (Court of Chancery), 98 N.J. Eq. 569; 131 Atl. Rep. 210; Swetland v. Swetland, 100 N.J. Eq. 196; 134 Atl. Rep. 822; affirmed in part, 102 N.J. Eq. 294;140 Atl. Rep. 279; Crocker v. Crocker (Court of Chancery),112 N.J. Eq. 203; 164 Atl. Rep. 9; White v. Willever (PrerogativeCourt), 112 N.J. Eq. 546, 550; 165 Atl. Rep. 863; affirmed,118 N.J. Eq. 70; 177 Atl. Rep. 86; Apgar v. Hoffman (PrerogativeCourt), 113 N.J. Eq. 233, 234, 235 and 237;166 Atl. Rep. 159; Blanchard v. Blanchard (Court of Chancery), 116 N.J. Eq. 435,439; 174 Atl. Rep. 431; Higgins v. Mispeth (Court ofChancery), 118 N.J. Eq. 576, 580; 180 Atl. Rep. 562; King v.King (Court of Chancery), 17 N.J. Mis. R. 111; 5 Atl. Rep.
2d 695; affirmed, 125 N.J. Eq. 94; 4 Atl. Rep. 2d 405;Browning v. Browning (Court of Chancery), 126 N.J. Eq. 55,57; 7 Atl. Rep. 2d 816; Rippel v. King (Court ofChancery), 126 N.J. Eq. 297, 304; 8 Atl. Rep. 2d 777;Brooks v. Goff (Court of Chancery), 127 N.J. Eq. 115;10 Atl. Rep. 2d 466; Re Caroline Fisler Estate (PrerogativeCourt), 131 N.J. Eq. 310, 316; 25 Atl. Rep. 2d 265;affirmed, 133 N.J. Eq. 421; 30 Atl. Rep. 2d 894.
In the face of these decisions it cannot be doubted that this court, called upon to interpret the technical legal words in question, might properly and legally receive the evidence *Page 294 
it admitted, to identify the draftsman and to inform the court as to his knowledge of the words employed. Evidence of the circumstances and conditions surrounding the testator was also admitted — and properly so — to place the court, in so far as that may be possible, in the situation in which the testator was at the time he executed his will. Noice v. Schnell (Court ofErrors and Appeals), 101 N.J. Eq. 252, 272; 137 Atl. Rep. 582;Gillespie v. Gillespie (Court of Chancery), 96 N.J. Eq. 501; 126 Atl. Rep. 744; Eckermann v. Eckermann (Court ofChancery), 111 N.J. Eq. 112; 161 Atl. Rep. 806; Scarborough v.Scarborough, supra.
The testator was not learned in the law. He had attended a boarding school in England, which would prepare one to enter college, and had taken a commercial course in a Philadelphia business school. That was the extent of his schooling, yet it is proven that he revised his will without legal advice and selected and used the technical legal word "estate." The will was typewritten by Lewis S. Porter, one of the complainant-executors. Testator took a carbon copy or draft of an older will and, in two places, wrote above and before the words "Gordon Frederick Bottomley" the words "Estate of;" Mr. Porter copied the paper, including these added words, and the instrument was executed by the testator.
This is not a case where a situation has arisen which was not contemplated by the testator, nor one like that in Aitken v.Sharp, supra, where testatrix anticipated a situation and made provision to meet it, "but in doing so used an inapt word to express the purpose." Here, the testator faced a changed situation caused by the death of his nephew Gordon and met it by employing the descriptive term he had been habitually using in administering Gordon's estate and the trust created by Gordon's will. He waited until that trust had been established and was being administered before using the challenged term to give to Gordon's family what he undoubtedly would have given to Gordon had he lived. When testator died he held a seventy-eight per cent. interest in the partnership and business.
It is inconceivable that testator would give Harold four-tenths and Howland three-tenths of the residue of his estate *Page 295 
and intentionally select and employ words which would shut out the children of Gordon from any special recognition and benevolence and result in intestacy as to the remaining three-tenths. Yet that suggestion is also advanced by those who argue for a partial intestacy. The testator gave $50,000 to Lewis S. Porter, the junior partner who was unrelated to him, and he gave $30,000 to his nephew John W. Croft, Jr., who had rejected the opportunity given him to become testator's business associate. Would testator give a million and a half dollars to two of the nephews who had proven "their appreciation of the chance" he gave them and make no special provision for the family of Gordon, who also proved his appreciation? Would testator have made bequests of some $250,000 to thirty-four distant relatives, friends and old employees, and chosen to have done less for the children of Gordon Bottomley? The questions answer themselves.
The testator's gift of his residuary estate was to his two living nephews and to the estate of his deceased nephew. He then divided the residuary estate into three parts and directed that Harold was "to have" four-tenths, Howland three-tenths and the estate of Gordon three-tenths. He not only bequeathed three-tenths of his residuary estate to the estate of his deceased nephew and partner but directed that the "Estate of Gordon Frederick Bottomley" was "to have" that proportion of his residuary estate. A cardinal rule of will construction is, that effect must, if possible, be given to all its expressions.Traphagen v. Levy (Court of Chancery), 45 N.J. Eq. 448;18 Atl. Rep. 222.
The testator's use of the words "Estate of Gordon Frederick Bottomley" is readily understandable: He had qualified as an executor of that estate; he had directed that monthly interest checks of the partnership be made payable to "Estate of Gordon Frederick Bottomley," and these checks had been accepted and deposited in the account of the executors; in opening the executors' bank account, he had signed a signature card describing the account as "Estate of Gordon Frederick Bottomley;" he had signed checks in a check book furnished by the bank carrying, above the space for signatures, the printed words "Estate of Gordon Frederick *Page 296 
Bottomley;" he had signed and taken affidavit to a first and final account entitled "Estate of Gordon Frederick Bottomley, deceased" and he had executed a release and refunding bond so entitled; he had personally directed that the accounts of the executors be closed and the assets of the estate turned over to the trustees; he had taken upon himself the responsibility of carrying out Gordon's testamentary trust; and he was familiar with all the provisions of Gordon's will. His intention is certain — he proposed to add to the trust fund he had begun to administer for the benefit of Gordon's family, the moneys which he would undoubtedly have given to Gordon had Gordon lived.
A will should not be so construed as to impute to the testator a purpose to die intestate, or partially so, if it can be avoided. Bruce v. Bruce (Court of Errors and Appeals),90 N.J. Eq. 573, 575; 107 Atl. Rep. 434; reversing 90 N.J. Eq. 118; 105 Atl. Rep. 492. It will be presumed to have been the intention of the testator, at the time he executed his will, to dispose of his entire estate, and that he did not intend to die intestate as to any part. Parmentier v. Pennsylvania Co.
(Court of Chancery), 122 N.J. Eq. 25, 30; 192 Atl. Rep. 62,65; affirmed, 124 N.J. Eq. 272; 1 Atl. Rep. 2d 332. The presumption against an intestacy is particularly strong where, as here, the subject of the gift is a residuary estate. Lehigh v.Savidge (Court of Chancery), 14 N.J. Eq. 124, 134; Carter
v. Gray (Court of Chancery), 58 N.J. Eq. 411, 416;43 Atl. Rep. 711; Brooks v. Goff (Court of Chancery), 127 N.J. Eq. 115; 10 Atl. Rep. 2d 466; Danker v. Cooper (Court ofChancery), 114 N.J. Eq. 283, 285; 168 Atl. Rep. 640.
It is self-evident from the will before the court, explained by the proven circumstances and conditions surrounding the testator at the time he made that instrument, and I hold, that he intended the words "Estate of Gordon Frederick Bottomley" to be descriptive of the trust created by Gordon in his will and to pass three-tenths of the residue of his estate into that trust to be administered by Gordon's trustees in accordance with the terms of Gordon's will.
 The fifteenth clause of testator's will reads: *Page 297 
"Fifteenth. Should there be any dissatisfaction or attempt by any beneficiary under my Will or any Codicil I may make thereto, to prevent the carrying out of my desires or to frustrate my wishes, then it is my will and I do order that such beneficiary or beneficiaries shall receive nothing from my estate."
The bill for construction, in the present case, was filed by the executors. They were persuaded to institute these proceedings, they say, because of some question raised by a title company. Mary Christine McCloskey was made a party defendant and, with the defendants John W. Croft, Jr., Anne Croft and Evelyn Croft, filed an answer questioning the interpretation put upon testator's will by the executors. The executors had made payment of the bequests to John W. Croft, Jr., Anne Croft and Evelyn Croft before any question was suggested persuading them to institute these proceedings. The executors seek the advice of this court as to whether or not the defendant Mary Christine McCloskey has, by her action, forfeited testator's bequest to her as one of his grandnieces.
Miss McCloskey was not a witness on final hearing and, so far as the evidence discloses, has done nothing more than to join with her uncle and her two aunts in retaining counsel, filing answer and presenting an interpretation of the questioned portions of the will. Courts have generally adopted the view that, on a bill for construction filed by executors, a defendant brought before the court may freely express his view as to the proper construction of the will without risk of incurring the penalty of forfeiture, and this, even though his participation lead to a decree which, by virtue of the law, invalidates the will.
In Federal Trust Co. v. Ost (Court of Chancery),120 N.J. Eq. 43; 183 Atl. Rep. 830, Vice-Chancellor Stein had before him a suit for construction, instituted by executors; all beneficiaries were present as defendants, and although disclaiming any purpose of contesting the will or any of its provisions, argued successfully for an interpretation which resulted in a partial intestacy. This, said the court, came "perilously near" a violation of the will. If, the court added, the beneficiaries had initiated the proceedings he would have *Page 298 
had no hesitation in declaring such action a forfeiture of their right to take under the will. However (at p. 65), the court says:
"It seems to me that when the language of a will is under investigation and the testator's intention is being inquired into a beneficiary may freely speak, when brought into the cause, without incurring the penalties provided in the will against a contesting beneficiary, even though while so speaking the beneficiary contends for a construction which will by operation of law render provisions of the will invalid * * *. For assisting the court in furnishing facts and presenting arguments the beneficiary should not be penalized, where that service comes not from a volunteer but from an invitee."
Vice-Chancellor Stein was careful to distinguish the case before him from a decision he had made a year earlier in Cross
v. French, 118 N.J. Eq. 85; 177 Atl. Rep. 456; affirmed, with modifications as to another point, in 119 N.J. Eq. 563;182 Atl. Rep. 834. In the Cross Case a testator's daughter filed a caveat against the probate of her father's will, without probable cause, and so was held to have forfeited her right to take under the provision made for her in the will.
Although decisions of the courts of the several states reflect a lack of uniformity touching the enforcement of no-contest provisions, the clear weight of the authorities exempts from forfeiture a beneficiary who participates, in invitum, in proceedings for construction only. It is undoubtedly true that a general rule cannot be stated that will be dispositive of all conceivable suits for construction; in each individual case the conduct of the litigant must be carefully weighed in the light of the language of the testamentary provision. In the instant case, I find that the conduct of the defendant Mary Christine McCloskey has not fatally offended the provisions of the will. *Page 299