OSTRER, J.A.D.
*528 *154 The principal issue in this appeal is whether a trial court may look beyond the apparently plain language of a trust that benefitted the settlor's "grandchildren," to determine whether the settlor intended to benefit only some of her grandchildren. We conclude a court may. As the trial court here confined itself to the words found within the four corners of the trust, we reverse the grant of partial summary judgment to a claimed beneficiary, and remand for trial.
I.
The late Violet Nelson left trust property to her "grandchildren" per capita after the death of her husband, an income beneficiary. The trust stated that "the then principal and all accrued or undistributed net income of the trust shall be distributed in equal shares per capita and not per stirpes to Settlor's grandchildren who survive Settlor ...." On its face, the trust apparently benefited all six children of Violet's three children-sons Jacob (known as "Jack") and Robert, and daughter Jacoba.[1]
Jack, the trustee, sought a declaratory judgment that Jacoba's two sons were not included among Violet's "grandchildren." He maintains that Violet did not consider Jacoba's sons to be her *155 "grandchildren," because Jacoba married outside their Orthodox Jewish faith. Jack contends that after Jacoba's marriage in 1970, Violet mourned her as if she were dead and cut off contact with her.
That fact and other extrinsic evidence allegedly illuminate the restrictive meaning of "grandchildren" that Jack propounds. The attorney who drafted the trust stated that he understood that Violet did not count Jacoba's children among her grandchildren, nor even acknowledge their existence. He used the word "grandchildren" to include only Jack's and Robert's children. Although Jack and Violet's husband directed the attorney to draft the trust, the attorney said that he reviewed the trust with Violet, explained that only Jack's and Robert's children would benefit, and she understood.
Jack acknowledges that after years of silence between Violet and Jacoba, the two attempted reconciliation in 1986. But he contends relations were cut off again after Violet learned that Jacoba's children had been baptized. Jack points to an unprobated will Violet signed in 1988. It identified Jacoba as her daughter, but omitted Jacoba's sons among the listed grandchildren, and expressly left nothing to Jacoba or her "surviving issue." A 2001 codicil also referred only to her "four grandchildren."
One of Jacoba's sons, Jared Lina, opposed Jack's declaratory judgment action. Jared and his brother first learned the trust existed when its scrivener sent him a letter, asking him to renounce and waive any claim. Jared refused. He contended the trust was clear on its face. He also marshaled competing extrinsic evidence to *529 show that Violet intended to bestow her property on her grandchildren without exception. He presented evidence of the reconciliation between his mother and Violet in 1986. He included letters in which Violet expressed her love for Jacoba and alluded to the role her husband played in the schism between them. Jared also described gatherings involving his branch of the family and Jack's family, to belie the claim that his mother's side was "dead" *156 to the rest of the family. He noted that his mother visited Violet during her final illness.
Jared filed a counterclaim, alleging that Jack breached his fiduciary duty by wrongfully retaining income from the trust after his father died, rather than promptly terminating the trust and distributing the principal and income to the grandchildren. Jared also sought an accounting and appointment of a successor trustee.
After a period of discovery, Jared and Jack filed cross-motions for summary judgment on the trust's interpretation.[2] The trial judge determined that Jared and his brother were trust beneficiaries. The court relied solely on the plain meaning of "grandchildren." The judge concluded that In re Estate of Gabrellian, 372 N.J. Super. 432, 443, 859 A.2d 700 (App. Div. 2004), which we discuss below, barred the court from considering extrinsic materials. The judge acknowledged that had he looked beyond the trust's four corners, the evidence would have created a genuine issue of material fact, which would have precluded summary judgment for either side.
The court later denied Jack's subsequent motion to reconsider. Jack contended the court should have applied the New Jersey version of the Uniform Trust Code (NJUTC), L. 2015, c. 276, codified at N.J.S.A. 3B:31-1 to -84, which was enacted while the cross-motions were pending. Jack invoked two sections of the new law that allow a court to construe or reform a trust to conform to a settlor's probable intent. N.J.S.A. 3B:31-31 (Section 31) states, "The court may reform the terms of a trust, even if unambiguous, to conform the terms to the settlor's probable intent if it is proved by clear and convincing evidence that there was a mistake of fact *157 or law, whether in expression or inducement." The following section states, "Nothing in this act shall prevent the court from construing the terms of a trust, even if unambiguous, to conform to the settlor's probable intent." N.J.S.A. 3B:31-32 (Section 32).
The court held that the NJUTC did not apply because its effective date occurred after the decisions on the cross-motions and the motion to reconsider. See L. 2015, c. 276, § 4 (stating the act shall take effect on the 180th day after enactment). The court was unconvinced that Sections 31 and 32 of the NJUTC applied pursuant to N.J.S.A. 3B:31-84(a)(3). That section states that, except as otherwise provided, the new law "applies to judicial proceedings concerning trusts commenced before its effective date unless the court finds that application of a particular provision ... would substantially interfere with the effective conduct of the judicial proceedings or prejudice the rights of the parties ...." Ibid.
The court had earlier denied Jared's motion to dismiss Jack's complaint for lack of standing and to appoint a substitute *530 trustee. In the order denying Jack's motion for reconsideration, the court granted Jared's request for an accounting-the court having determined that Jared, as a recognized beneficiary, had standing to request one. The court also awarded Jared fees.
Jack thereafter appealed from the court's order that found Jared and his brother to be beneficiaries. Jared cross-appealed from the order denying his motion to dismiss and to appoint a substitute trustee.
II.
In considering Jack's appeal from the grant of summary judgment, we review the trial court's order de novo, and employ the same standard as the motion judge under Rule 4:46-2(c). Henry v. N.J. Dep't of Human Servs., 204 N.J. 320, 329-30, 9 A.3d 882 (2010). We do not quarrel with the trial court's assessment that the evidential materials on file create a genuine issue of fact as to the intended meaning of the term "grandchildren." But the trial *158 judge concluded the fact issue was not material, as he believed he was bound to apply the plain meaning of the term. As to that legal conclusion, we disagree.
The court's primary goal in interpreting a trust agreement is to fulfill the settlor's intent. "[T]he goal always is the ascertainment of the testator's intent and it is not to be thwarted by unduly stressing 'the literal meaning' of his words." Fidelity Union Trust Co. v. Robert, 36 N.J. 561, 565, 178 A.2d 185 (1962) (quoting Bank of New York v. Black, 26 N.J. 276, 284, 139 A.2d 393 (1958) ). The court may even read a trust or will "contrary to its primary signification" if necessary "to prevent the intention of the testator from being defeated by a mistaken use of language." Id. at 566, 178 A.2d 185 (citation omitted); see also In re Estate of Branigan, 129 N.J. 324, 331-32, 609 A.2d 431 (1992) (noting that under the doctrine of probable intent the courts have "construed the language of a will in a fashion contrary to its literal, technical, or settled meaning"); Bottomley v. Bottomley, 134 N.J. Eq. 279, 291, 35 A.2d 475 (Ch. 1944) (recognizing judicial power "to effectuate the manifest intent of a testator by inserting omitted words, by altering the collocation of sentences, or even by reading his will directly contrary to its primary signification is well established").
The Court has acknowledged that in ascertaining intent, its focus really is probable intent. "[W]hen we say we are determining the testator's intent, we mean his probable intent." Fidelity Union, 36 N.J. at 564, 178 A.2d 185 ; see also In re Estate of Payne, 186 N.J. 324, 335, 895 A.2d 428 (2006). The Court speaks of "probable intent" because "it is impossible to determine with absolute certainty [the testator's] actual subjective intent." Morristown Trust Co. v. McCann, 19 N.J. 568, 572, 118 A.2d 16 (1955).
The Court "continue[s] to adhere to the view of the doctrine of probable intent expressed in Fidelity Union." Payne, 186 N.J. at 335, 895 A.2d 428. The doctrine does not permit a court to "conjure up an interpretation or derive a missing testamentary provision out of whole cloth." Engle v. Siegel, 74 N.J. 287, 291, 377 A.2d 892 (1977) (quoting *159 In re Estate of Burke, 48 N.J. 50, 64, 222 A.2d 273 (1966) ). However, a court "may, on the basis of the entire will, competent extrinsic evidence and common human impulses strive reasonably to ascertain and carry out what the testator probably intended ...." Ibid. (quoting Burke, 48 N.J. at 64, 222 A.2d 273 ).
The doctrine is enshrined in statute. See N.J.S.A. 3B:3-33.1. That states that the *531 trust's language and statutory rules of construction control "unless the probable intent of such settlor or of such individual, as indicated by the trust or by such governing instrument and relevant circumstances, is contrary." N.J.S.A. 3B:3-33.1(b). See William A. Dreier, Paul A. Rowe, and Andrea J. Sullivan, Guidebook to Chancery Practice in N.J., § V(C)(1) (9th ed. 2014) (noting that N.J.S.A. 3B:3-33.1 codifies the judicial doctrine of probable intent).[3]
The judicial effort to fulfill a settlor's or testator's probable intent takes two forms: interpretation, and reformation. It is sometimes difficult to discern which task a court has undertaken. The former involves finding the meaning "of language already in the instrument." See Uniform Trust Code, cmt. to § 415, 7C U.L.A. 515 (2000).[4] For example, in In re Trust Created by Agreement Dated Dec. 20, 1961, ex rel. Johnson, 194 N.J. 276, 280, 944 A.2d 588 (2008), a principal issue involved interpreting the word "spouses" to determine whether the settlor intended to benefit "surviving spouses," where the trust expressly benefitted the settlor's children and "their spouses."
*160 On the other hand, reformation involves remaking or modifying an instrument, to correct mistakes, to fulfill an unexpressed intention, or to address circumstances that were unforeseen. Uniform Trust Code, cmt. to § 415 ; see, e.g., Branigan, 129 N.J. at 335, 609 A.2d 431 (reforming a testamentary trust to account for changes in tax law after testator's death); compare Restatement (Third) of Prop.: Wills and Donative Transfers §§ 11.1-11.3 (Am. Law Inst. 2003) (discussing interpretation of ambiguous provisions of a will or trust), with id. §§ 12.1-12.2 (discussing reformation of a will or trust).[5]
The preponderance-of-the-evidence standard of proof applies to interpretation; however, the more rigorous clear-and-convincing standard of proof applies to reformation. See Fidelity Union, 36 N.J. at 565, 178 A.2d 185 (stating "the object is to ascertain 'the probable intent' of the testator by a 'preponderance of the evidence' "); Pivnick v. Beck, 326 N.J. Super. 474, 481, 741 A.2d 655 (App. Div. 1999) (noting that "[r]eformation of trust agreements in probate actions requires clear and convincing proof"), aff'd, 165 N.J. 670, 671, 762 A.2d 653 (2000) (noting "preponderance of evidence to resolve ambiguity in donative instruments; clear and convincing evidence to reform such instruments" (quoting Restatement (Third) of the Law Governing Lawyers § 51 cmt. f (Am. Law Inst. 1998) ) ); see also St. Pius X House of Retreats, Salvatorian Fathers v. Diocese of Camden, 88 N.J. 571, 581, 443 A.2d 1052 (1982) (reformation is proved by clear and convincing evidence); Restatement (Third) Prop. § 10.2, cmt. i; but see *532 In re Estate of Munger, 63 N.J. 514, 521, 309 A.2d 205 (1973) (stating that a court must be "thoroughly convinced" of a testator's probable intent, where the interpretative issue pertained *161 to whether the trustee's power to invest in "securities" included real estate).
The higher standard of proof for reformation is warranted to prevent reliance on "contrived evidence." Uniform Trust Code, cmt. to § 415 ; see also Restatement (Third) Prop. § 12.1, cmt. e. The NJUTC expressly states that the clear-and-convincing standard applies to reformation of trust terms to correct mistakes and conform to the settlor's probable intent. N.J.S.A. 3B:31-31.[6]
With respect to interpretation, our courts have long disapproved the so-called "plain meaning rule," which bars a court from looking beyond the face of a writing to consider extrinsic evidence in ascertaining intent. "Evidence of the circumstances is always admissible in aid of the interpretation of an integrated agreement. This is so even when the contract on its face is free from ambiguity." Atlantic N. Airlines v. Schwimmer, 12 N.J. 293, 301, 96 A.2d 652 (1953) ; see also Conway v. 287 Corp. Ctr. Assocs., 187 N.J. 259, 269, 901 A.2d 341 (2006) (quoting Schwimmer and noting that the Court has long followed Professor Corbin's "expansive view" of a court's interpretative task). "[I]n construing contractual instruments, our courts will broadly search for the probable common intent of the parties, will consider their relations, the attendant circumstances and the objectives they were trying to obtain, and will endeavor to find a reasonable meaning 'in keeping with the express general purpose.' " Fidelity Union, 36 N.J. at 567, 178 A.2d 185 (quoting Tessmar v. Grosner, 23 N.J. 193, 201, 128 A.2d 467 (1957), a contract case). If an ambiguity exists, then resolution of the document's intended meaning is a fact issue. Michaels v. Brookchester, Inc., 26 N.J. 379, 387-88, 140 A.2d 199 (1958).
*162 If anything, these principles of interpretation apply with greater force in interpreting trusts and wills. In construing contracts, "courts may be confronted with significant problems of reliance and the troublesome goal of effecting the common intent of different parties whereas in the construction of wills, there are fewer problems of reliance and the goal is the effectuation of the intent of the testator alone." Fidelity, 36 N.J. at 567, 178 A.2d 185.[7]
*533 The Supreme Court held in Wilson v. Flowers, 58 N.J. 250, 263, 277 A.2d 199 (1971), that it does not matter whether an ambiguity was "latent"-that is, discernable only by resort to extrinsic evidence-or "patent"-identifiable on the face of the document. "[I]n deciding whether there is an ambiguity, a court should always admit extrinsic evidence including direct statements of intent since experience teaches that language is so poor an instrument for communication or expression ...." Ibid. Extrinsic evidence shall be considered twice: to determine if there is ambiguity, and, if there is, to resolve it. Ibid.; see also In re Estate of Baker, 297 N.J. Super. 203, 212, 687 A.2d 1047 (App. Div. 1997). If *163 a factual issue remains, the court must conduct an evidentiary hearing. Baker, 297 N.J. Super. at 212-13, 687 A.2d 1047.
"Once the evidence establishes the probable intent of the testator, 'the court may not refuse to effectuate that intent by indulging in a merely literal reading of the instrument.' " Payne, 186 N.J. at 335, 895 A.2d 428 (quoting Wilson, 58 N.J. at 260, 277 A.2d 199 ). In Wilson, the Court held, based on resort to extrinsic evidence, that a testator's provision that a portion of his residuary trust be dedicated to "philanthropic causes," meant "charitable causes," a narrower category. 58 N.J. at 264, 277 A.2d 199.
Against the backdrop of this substantial authority, we cannot endorse the general statement in Gabrellian, 372 N.J. Super. at 443, 859 A.2d 700, upon which the trial court relied (and for which we intend no criticism), that "[t]he doctrine of probable intent is not applicable where the documents are clear on their face and there is no failure of any bequest or provision." As noted, a court may resort to extrinsic evidence to unveil ambiguity that does not appear on the document's face.
Nor is our Court's long-held resistance to the "plain meaning rule" limited to cases where there is a failure of a bequest. For example, in Branigan, 129 N.J. at 336, 609 A.2d 431, the Court was faced not with a failure of a bequest; just a higher tax bill under laws enacted after the will's execution. Given the testator's overarching intent to reduce tax liability, the Court reformed the terms of a testamentary trust to "derive maximum benefits under the federal estate tax laws." Id. at 335-36, 609 A.2d 431. See also Payne, 186 N.J. at 338, 895 A.2d 428 (applying probable intent doctrine to interpret a "just debts clause" to require estate to pay off mortgage debt on two properties, where will expressly referred only to one of them).
We should not tolerate interpreting a trust to provide benefits the settlor did not intend. "The claim of an unintended taker is an unjust claim." Restatement (Third) Prop. § 12.1 cmt. b. In *164 In re Estate of Bonardi, 376 N.J. Super. 508, 517-18, 871 A.2d 103 (App. Div. 2005), the court relied on the trust's text, and extrinsic evidence from the scrivener, to bar "acceleration and termination of [a] trust [that] would have resulted in a distribution to a person other than those intended by the testator." The settlor's probable intent deserves vindication to bar unintended takers, as well as to protect intended beneficiaries.
In any event, the statement in Gabrellian was unnecessary to its holding. The testator's adult son sought reformation of his father's will. He was not suggesting that any particular word or phrase was ambiguous and should be construed in his favor. Aside from a $625,000 bequest, the will left the father's entire residuary estate, including business assets, to his wife.
*534 The son contended that, despite the will's clear language, his father intended to leave him in control of the father's business. 372 N.J. Super. at 440, 859 A.2d 700. The son failed to marshal evidence of his father's purported intent. The court found, "There is nothing to support's [the son's] claim ... to retain control of his father's businesses." Id. at 443, 859 A.2d 700.
III.
Jack's principal argument depends on interpretation of the trust's language. He contends the simple word "grandchildren" had a meaning personal to Violet, which excluded Jacoba's sons. Alternatively, he contends that the scrivener made a mistake, by failing to identify the grandchildren Violet intended to benefit; and the trust should be reformed to conform to that intent. In assessing both arguments, the trial court was obliged to consider the extrinsic evidence Jack presented.
We are satisfied that, extending to Jack all favorable inferences, extrinsic evidence demonstrated that "grandchildren," as the term was used in this trust, was ambiguous. While "grandchildren" generally means "the children of children," Jack presented evidence that Violet used the term in a different sense, personal to her. "[A] latent ambiguity arises if the donor's personal usage differs from the ordinary meaning of a term used in the text."
*165 Restatement (Third) Prop. § 11.2 cmt. r; see also id., illus. 22 (where extrinsic evidence demonstrated that testator habitually referred to his actual grandchildren as "cousins," will that left property to "my cousins" could be interpreted to benefit the grandchildren); id. § 14.10 cmt. d (although generally a "term of a relationship in a class gift does not include relatives by marriage," contrary intention may be demonstrated by "[e]xtrinsic evidence that the donor habitually referred to his or her relatives by marriage as his or her relatives").
Jack has presented sufficient extrinsic evidence to support a conclusion that "grandchildren" meant not all children of Violet's children, but the children of her sons, who continued to practice her religion, and not the sons of her daughter who inter-married. Having established ambiguity, Jack is obliged to demonstrate by a preponderance of the evidence that his proposed meaning is the one that fulfils Violet's intent.[8] He may do so by marshaling extrinsic evidence. Of course, Jared may counter that with evidence of his own.[9]
Even if the court as fact-finder is not persuaded that "grandchildren" excluded Jacoba's children, Jack should be allowed to establish that the scrivener made a mistake in using the word, and in drafting the trust without identifying the four grandchildren Violet intended to benefit. That would require reformation of the *166 trust. *535 Jack would bear the burden of demonstrating that general intent by clear and convincing evidence.
Given our disposition, we need not reach Jack's contention that N.J.S.A. 3B:31-31 and -32 of the NJUTC apply pursuant to N.J.S.A. 3B:31-84. Under prior law, as we have described, the trial court was obliged to consider extrinsic evidence.
Finally, Jared's cross-appeal lacks sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).
Reversed and remanded. We do not retain jurisdiction.

The trust delayed distribution to any grandchildren under twenty-one years of age. When Violet executed the trust in 2005, two of the grandchildren fell into that category. Robert's only child was sixteen. The youngest of Jack's three children was nineteen.

Jack filed his motion on behalf of himself and his three children as "parties in interest." All four filed the notice of appeal. However, for convenience, we will refer to appellant as Jack. We note that neither Robert's son, nor Jared's brother Jason, formally participated in the litigation. Jason wrote an email to the trust's scrivener recognizing that Violet never intended to leave him a share. He expressed his willingness to renounce in writing any interest in the trust, provided there were no negative tax consequences to him.

Enactment of the NJUTC did not affect N.J.S.A. 3B:3-33.1, which appears consistent with N.J.S.A. 3B:31-31, -32, quoted above.

Section 31 of the NJUTC is based on Section 415 of the uniform law. Only the former uses the term "probable intent." Section 415, by comparison, states: "The court may reform the terms of a trust even if unambiguous, to conform the terms to the settlor's contention if it is proved by clear and convincing evidence that both the settlor's intent and the terms of the trust were affected by a mistake of fact or law, whether in expression or inducement." Uniform Trust Code, § 415.

In interpreting an instrument, the court attempts to ascertain actual and specific intent, even if not clearly expressed. In reforming an instrument, the court ascertains actual intent, mistakenly expressed, or inferred intent, that is, what the settlor or testator "probably intended should be the disposition if the present situation developed." Burke, 48 N.J. at 64, 222 A.2d 273.

The New Jersey drafters of the NJUTC stated their intention to preserve existing law pertaining to the doctrine of probable intent. Sponsor's Statement to Assembly Bill No. 2915, at 37 (March 13, 2014). We therefore presume that it did not intend to preclude resort to the preponderance-of-the-evidence standard where discernment of probable intent involves interpretation, not reformation.

We recognize that our Court has enunciated a less expansive view of statutory construction. In discharging its responsibility to effectuate the Legislature's intent, a court shall "start with the plain language of the statute. If it clearly reveals the Legislature's intent, the inquiry is over." State v. Harper, 229 N.J. 228, 237, 160 A.3d 1281 (2017) ; see also In re Kollman, 210 N.J. 557, 568, 46 A.3d 1247 (2012) ("If the plain language is clear, the court's task is complete."). Whether this represents a shift in our jurisprudence, we need not say. Compare Fidelity, 36 N.J. at 568, 178 A.2d 185 (stating, regarding statutory construction, that "when the probable intent is made manifest, any language which may read literally to the contrary must give way"). Our modern Court has not hesitated to look beyond the apparently plain meaning of a statute when it "would lead to absurd results," Harper, 229 N.J. at 237, 160 A.3d 1281, or violate "the overall statutory scheme." DiProspero v. Penn, 183 N.J. 477, 493, 874 A.2d 1039 (2005). In any event, a stronger case can be made for applying the "expansive view" to interpreting donative instruments, because one is ascertaining the intent of a single donor; and, unlike a Legislature that can correct its own mistakes, a donor is often unable to correct or refine the expression of his or her intent. See Restatement (Third) Prop. § 12.1, Reporter's Note 5 to cmt. d.

Although the scrivener here stated he used "grandchildren" to conform to Violet's personal sense of the term, use of a professional scrivener may tend to counter evidence of personal usage. Restatement (Third) Prop. § 1.2 cmt. r. Also, although a scrivener may relate objective manifestations of a settlor's intent, such as statements and conversations with the settlor, In re Trust Created by Agreement, 194 N.J. at 282, 944 A.2d 588, and the scrivener's own "rationale for selecting certain language," id. at 285, 944 A.2d 588, a scrivener may not offer a lay opinion about a settlor's "unspoken thought processes," id. at 283, 944 A.2d 588.

For example, although Jack relies on Violet's explicit exclusion of Jacoba's children in her will as evidence of a similar intention in the trust, the omission of such an explicit exclusion in the trust may instead reflect her intent to include all the children of her children.