**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-2847-16T4
              A-3044-16T4

IN THE MATTER OF THE
ESTATE OF VICTOR
VINCENT ALFIERI,

      Deceased.

_____

IN THE MATTER OF THE
ESTATE OF ANTOINETTE
ALFIERI,

      Deceased.

_____

Argued November 26, 2018 – Decided October 3, 2019

Before Judges Fasciale, Gooden Brown and Rose.

On appeal from the Superior Court of New Jersey, Chancery Division, Morris County, Docket Nos. P-002363-2011 and P-000377-2013.

Meredith Leigh Grocott argued the cause for appellants/cross-respondents Barbara Stella and Matthew Stella (Schenck, Price, Smith & King, LLP, attorneys; Meredith Leigh Grocott, of counsel and on the briefs).

Donald M. McHugh and Cathyanne A. Pisciotta argued the cause for respondent/cross-appellant Estate of Victor Alfieri and respondent Estate of Antoinette Alfieri (McHugh & Macri, and Pisciotta & Menasha, LLC, attorneys; Donald M. McHugh and Cathyanne A. Pisciotta, on the joint briefs).

John L. Pritchard argued the cause for respondent/cross-appellant Charles Bradley Morton III.

The opinion of the court was delivered by

GOODEN BROWN, J.A.D.

These consolidated appeals and cross-appeals challenge several Chancery Division orders in a probate matter involving bequests in wills executed by Victor and Antoinette Alfieri. Victor and Antoinette[1] were two of seven siblings.[2] They were unmarried and lived together in East Hanover (the East Hanover property) until Victor died in 2011. Antoinette died two years later in 2013. Having no children of their own, in wills that mirrored each other, each had bequeathed his or her entire estate to the surviving sibling, and, upon that sibling's death, to specified siblings as well as nieces, nephews, grandnieces, and grandnephews. Because Victor predeceased Antoinette, Antoinette's will,

---

[1] We refer to the parties by their first names to avoid any confusion caused by their common surnames. We intend no disrespect by this informality.

[2] Three of the siblings predeceased Victor and Antoinette.

bequeathing sizeable assets, is at the core of these appeals. These assets included bequests of $40,000 each to seven specified nieces and nephews, and Victor's brokerage account worth over $600,000 to six grandnieces and grandnephews.

The central issues raised in these appeals are whether the brokerage account, which was transferred from one firm to another prior to Victor's death, adeemed and should thereby pass to the residuary as claimed by the co-executors; whether the co-executors mishandled the East Hanover property; and whether one of the nephews omitted from Antoinette's will was entitled to a $40,000 bequest. The trial court determined that the brokerage account adeemed, that the omitted nephew was not entitled to the bequest, and that the co-executors did not mishandle the East Hanover property. Other related issues include the denial of the co-executors' motion for sanctions under the frivolous litigation statute, N.J.S.A. 2A:15-59.1; the denial of a motion to intervene filed by one of the grandnephews; and the award and denial of counsel fees.

Specifically, Barbara Morton Stella, a niece of Victor and Antoinette, appeals from the February 2, 2016 orders, denying her motion for a declaratory judgment and granting summary judgment to the Estates; the May 6, 2016 order, denying reconsideration of the summary judgment order, which determined that

the brokerage account adeemed; the June 27, 2016 order, awarding counsel fees to the Estates' attorneys; and the January 26, 2017 order, approving the final accounting of the Estate of Victor Alfieri (Victor Estate) and the Estate of Antoinette Alfieri (Antoinette Estate) (collectively, the Estates). Barbara's son, Matthew Stella, a grandnephew of Victor and Antoinette, cross-appeals from the January 26, 2017 order, denying his motion to intervene. Barbara's brother, Charles Bradley Morton III, a nephew of Victor and Antoinette, appeals from the February 2, 2016 order, denying him a $40,000 bequest from the Antoinette Estate; and the June 27, 2016 order, denying him counsel fees. Finally, the Victor Estate cross-appeals from the May 6, 2016 order, denying its motion for sanctions against Barbara pursuant to the frivolous litigation statute. Having considered the arguments and applicable law, we reverse the provision of the February 2, 2016 summary judgment order, determining that the brokerage account adeemed. In all other respects, we affirm.

I.

We derive the following facts from the record. Victor and Antoinette's long-time neighbor, friend, and attorney, Donald McHugh, drafted both of their wills. Victor executed his will on July 20, 2006, and Antoinette executed hers on July 20, 2007. Both wills named Joanne Cannici and Felicia Feldman, two

of their nieces, as co-executors.[3] In the second article of both wills, the surviving sibling inherited the deceased sibling's entire estate. However, if the surviving sibling was disabled or unable to live independently and manage his or her own affairs, then all the assets of the estate would pass to a testamentary trust established to support the disabled or dependent sibling.

The third article of both wills bequeathed certain assets to Victor and Antoinette's nieces, nephews, grandnieces, and grandnephews upon the death of the surviving sibling and the termination of the testamentary trust, if one had been established. Pertinent to this appeal, article three of Antoinette's will specifically provided:

> If my beloved brother shall not survive me or upon his demise during the trust term, then I bequeath and appoint the residue of my estate, real and personal, as follows:
>
> A.    The balance of the pre-death shareholdings of VICTOR VINCENT ALFIERI in his brokerage account at Smith Barney, in equal shares, to each of my grandnephews and grandnieces, who are the grandchildren of my siblings, ELIZABETH JANE CANNICI, JOHN CHARLES ALFIERI[,] and ANNA

[3]  Additionally, on July 20, 2007, Victor and Antoinette each executed durable powers of attorney, designating each other as power of attorney. Joanne and Felicia were designated as "alternate co-attorneys in fact" in the event Victor and Antoinette were "unable to act for any reason[,]" including death, removal or resignation.

MARIE ALFIERI MORTON,[4] per capita and not per stirpes.

B.     The sum of Forty Thousand . . . Dollars to each of my following nieces and nephews, JOANNE CANNICI, JOHN CANNICI, STEPHEN CANNICI, FELICIA ALFIERI FELDMAN, LINDA ALFIERI WILLMAN, BRENDA ANN MORTON[,] and BARBARA ANN MORTON STELLA, per stirpes and not per capita.

C.     The rest, residue and remainder of my estate to my siblings, ELIZABETH JANE CANNICI, JOHN CHARLES ALFIERI[,] and ANNA MARIE ALFIERI MORTON, per stirpes and not per capita.

The fourth article expressly exempted Antoinette's brother, Ralph Louis Alfieri, and his family from any bequests because she had "no contact with him for many years."  Additionally, the seventh article appointed as trustee "the surviving parent of [any] beneficiary" who was under twenty-five years of age when the estate became payable, "to have and to hold . . . in trust," "for the health and education of such beneficiary . . . until such beneficiary attains the age of [twenty-five] years."

In July 2011, Victor and Antoinette executed substantively identical codicils.  Antoinette's codicil amended paragraph B of the third article and

---

[4]  Barbara, Charles, and Brenda Ann Morton are the children of Anna Marie Alfieri Morton.  In addition to her son, Matthew, Barbara has a daughter, Christina Stella.

clarified that "should STEPHEN CANNICI predecease me, his share shall pass to his natural born children and not to COURTNEY CANNICI. She is the child of LORI CANNICI and was adopted by STEPHEN CANNICI." Other than this amendment, the codicil "ratif[ied] and republish[ed]" Antoinette's July 20, 2007 will.

By 2011, Victor and Antoinette were in their eighties and experiencing failing health. Prior to his death, with the assistance of McHugh, Victor took various steps for healthcare and estate planning purposes. Among them, on August 30, 2011, Victor executed a deed giving himself a life estate in the East Hanover property he shared with Antoinette, and transferred the remainder interests to designated siblings and nieces as tenants in common. Specifically, one-third was transferred to each of his siblings, Elizabeth Jane Cannici and John Charles Alfieri, and the remaining one-third was divided equally between his nieces, Brenda Ann Morton and Barbara Morton Stella.

On the same date, Victor transferred the assets in his Morgan Stanley Smith Barney brokerage account to Oppenheimer & Co., another brokerage firm. The brokerage account had substantially increased in value from approximately $10,000 in 2006 to over $600,000 in 2011. During his deposition, when questioned about the testamentary intent of the parties in

relation to the brokerage account, McHugh testified he had no discussion with Victor or Antoinette about transferring the assets in the brokerage account. However, McHugh acknowledged that in 2011, when he "specifically asked [Victor]" whether he "want[ed] 600 and some-odd thousand dollars to go to [his] grandnieces and [grand]nephews[,] . . . his answer was, '[n]o, I do not.'" Additionally, during their respective depositions, both Felicia and Joanne denied ever having any discussion with Victor regarding the Smith Barney account. Victor Puglio, an Oppenheimer broker, was one of three financial advisors recommended to Victor by McHugh. Puglio testified during his deposition that Victor transferred the assets from Smith Barney to Oppenheimer for "[a] consolidation and review." Puglio denied ever meeting or even speaking with Antoinette.

In addition, on August 30, 2011, Joanne and Felicia established the "Antoinette E. Alfieri Supplemental Benefits Trust" (the SBT), "an [i]rrevocable [t]hird-[p]arty [t]rust" established for "the sole benefit of and for the limited purposes" of "supplement[ing] the personal needs, medical care and general well-being of [the] [l]ifetime [b]eneficiary," Antoinette. "[S]ubject to prior payment of the bequests set forth in [Antoinette's] [w]ill[,]" the remainder beneficiaries of the SBT were Antoinette's siblings, Elizabeth Jane Cannici and

John Charles Alfieri, and the children of Antoinette's deceased sibling, Anna Marie Alfieri Morton, which included Barbara. Joanne and Felicia were appointed co-trustees of the SBT, and their execution of the trust agreement was witnessed by McHugh. A few days earlier, utilizing his power of attorney, Victor had transferred $740,000 of Antoinette's assets to Joanne and Felicia, and resigned his power of attorney in favor of them. Additionally, Victor transferred $178,746.86 from his money market account to Antoinette, and $280,000 from his checking account to Joanne and Felicia.

Shortly thereafter, on September 23, 2011, Victor died. At the time of Victor's death, Antoinette was residing at a rehabilitation facility following a hospitalization. Antoinette was later transferred to an assisted living facility, where she resided for approximately fifteen months, before being transferred to a nursing home about two months before her death on January 23, 2013. Because Antoinette never returned to live independently in the East Hanover property, prior to her death, Barbara's attorney, Meredith Grocott, requested in writing that the co-executors establish the testamentary trust for Antoinette as delineated in the second article of Victor's will. Grocott also requested an accounting of Victor's estate. McHugh responded in writing on the co-executors' behalf, ultimately denying both requests.

In his written responses, McHugh explained that Barbara was not entitled to "financial information" regarding Victor's estate because Antoinette was the sole beneficiary. Additionally, according to McHugh, the testamentary trust was not established because, based on "Antoinette's circumstances and medical prognosis, the conditions precedent to establishment of the trust in Victor's Will have not been met." McHugh explained that "the estate . . . intend[ed] to establish the Trust . . . if her medical and mental condition meets the standards noted in the Will" because the trust would "protect the assets due to Antoinette as sole beneficiary from [Medicaid's] long term care medical spend down" requirements. McHugh noted, however, that since no trust was established, any "court filing" by Barbara "would certainly be considered a frivolous lawsuit." After Antoinette died, McHugh reiterated in correspondence dated April 10, 2013, that "Barbara . . . and her children" were "not beneficiaries" of Victor's Will and no "trust was established" before Antoinette's death in which Barbara would have an interest.

As a result, on June 12, 2013, Barbara filed a verified complaint to compel an accounting and distribution of Victor's assets. In her complaint, Barbara alleged that given Antoinette's death, the testamentary trust established under the second article of Victor's will for the benefit of Antoinette "pass[ed] to the

remainder beneficiaries" as set forth in the third article of Victor's will, of which Barbara was "a remainder beneficiary." According to the complaint, "[e]ven if the co-executors . . . fail[ed] to fund the Trust, the assets in [Victor's] estate would then become an asset of the Estate of Antoinette," of which Barbara was "a residuary beneficiary." Barbara also alleged in the complaint that "[d]espite being a [one-sixth] owner of the East Hanover property," the co-executors wrongfully withheld notice of her interest in the property. She claimed the first time she became aware of her interest was "nearly five months after the deed was executed and nearly four months after [Victor's] death." She also alleged that the co-executors "wrongfully denied [her] access to the . . . property" until August 8, 2012. As a result, she was seeking "damages for breach of fiduciary duty" and "for denying [her] access" to the East Hanover property. Upon receipt of Barbara's complaint, pursuant to Rule 1:4-8, McHugh demanded in writing that she withdraw her complaint because it was frivolous litigation. In response, Barbara refused.

By July 2013, the bulk of Victor's estate was transferred to Antoinette's estate. At the direction of the co-executors, in a July 9, 2013 letter, McHugh, serving as the attorney of the co-executors, notified each of the intended beneficiaries of the bequests. Specifically, the letter indicated that "the former

11

Smith Barney account," valued at approximately $610,000 at the time of Victor's death, would be distributed equally to the six grandnieces and grandnephews named in Antoinette's will, and $40,000 would be allocated to each of the seven nieces and nephews named in the will "from other estate assets." The letter further advised that as stipulated in Antoinette's will, a trust would be established with their respective share for any grandnieces and grandnephews under the age of twenty-five.

Notwithstanding the position taken by McHugh on behalf of the co-executors in the July 9, 2013 letter, on May 23, 2014, the co-executors filed a verified complaint to approve the proposed accounting and distribution of the Antoinette Estate, claiming that the bequest to the grandnieces and grandnephews was "subject to ademption." According to the complaint, the third paragraph of Antoinette's Will left "'the balance of the pre-death shareholdings of [Victor's] . . . brokerage account at Smith Barney'" to the named grandnephews and grandnieces. However, "[t]he 'balance of pre-death shareholdings in Victor's Smith Barney account' as of Antoinette's date of death [was] valued at 'zero' as neither the account nor the funds . . . existed[,]" having been "transferred to Oppenheimer by Victor in August 2011, inherited by Antoinette, assimilated within her account and rebalanced to suit her particular

needs." The complaint alleged further that while "the Estate of Antoinette" was "ready for distribution[,]" with the value of the Oppenheimer account passing to the residuary, Barbara's lawsuit "against the Estate of Victor . . . seeking the posthumous funding of a supplemental benefits needs trust for the benefit of the now deceased Antoinette[,]" would "adversely impact the residuary beneficiaries of the Estate of Antoinette."

On June 13, 2014, the court consolidated the two estate litigations. In a hearing conducted prior to the consolidation, the court determined Barbara was entitled to an accounting and limited discovery of Antoinette's medical records. The court also entered an order indicating that Barbara and the co-executors "consent[ed] to the jurisdiction of [the c]ourt over the Estate of Antoinette" to "determine whether Courtney Cannici [was] a beneficiary of the brokerage account" referenced in both Victor's and Antoinette's wills, and to "determine how and at what time the brokerage account should be valued" for purposes of distribution.

On July 25, 2014, Barbara filed an answer to the co-executors' complaint "as beneficiary and nominated trustee" of Antoinette's will, claiming various exceptions to the accounting. In particular, she claimed that the brokerage account was not subject to ademption. Barbara's brother and Antoinette's

13

nephew, Charles, also filed an answer, claiming exceptions to the accounting and asserting he "should be deemed a residuary beneficiary" of Antoinette's Will under the anti-lapse statute, N.J.S.A. 3B:3-35, which provides that:

> If a devisee who is a . . . lineal descendant of a grandparent of the testator is dead at the time of the execution of the will, or fails to survive the testator, or is treated as if he predeceased the testator, the issue of the deceased devisee who survive the testator by 120 hours take in place of the deceased devisee and if they are all of the same degree of kinship to the devisee they take equally, but if of unequal degree then those of more remote degree take by representation.

Charles claimed "one-third of the one-third which would have otherwise passed to his mother, Anna Marie Alfieri Morton, as [she] predeceased Antoinette."  In his answer, Charles also asserted that he "should be deemed to be a beneficiary of a general devise of $40,000[]" pursuant to the will because "the omission of his name . . . was an obvious error which [was] contrary to the probable intent of the testator."

Given the exceptions to the accounting, the court denied the co-executors' motion for summary judgment without prejudice, and ordered the parties to engage in discovery, including conducting depositions.  In particular, in a March 6, 2015 order, the court ordered the co-executors to comply with Barbara's discovery requests by answering certain interrogatories and producing relevant

14

documents, and ordered McHugh to provide his scrivener's notes pertaining to the preparation of Victor's and Antoinette's wills. McHugh later responded that in 2011, he "discarded" his "checklists and/or notes" associated with the drafting of the wills.

Following the completion of discovery, the Estates again moved for summary judgment on all issues. Barbara opposed the motion and cross-moved for a declaratory judgment, pursuant to N.J.S.A. 2A:16-53 and -55, regarding the disposition of the brokerage account. Matthew filed a certification with his mother's cross-motion, requesting that Barbara continue to represent his interests in the litigation, or, in the alternative, requesting "permission to join" the litigation. Additionally, Charles moved for summary judgment on the anti-lapse issue and to be deemed a beneficiary of the $40,000 bequest.

On February 1, 2016, the court issued an oral decision, later supplemented by a February 2, 2016 written statement of reasons, disposing of several issues. Regarding Barbara's claim for damages stemming from the co-executors denying her access to the East Hanover property, the court acknowledged that, although Barbara's remainder interest in the property vested upon Victor's death, she did not receive a key until nearly one year later. Nonetheless, the court rejected Barbara's claim that the co-executors ousted her from the property as

"moot." The court reasoned that Barbara no longer had an "interest in the property" after it "sold in October 2012," and she "received approximately $70,000" from the sale proceeds. According to the court, Barbara "could have potentially had a claim for ouster before the home was sold," but took no "action to enforce her right to access the property."

The court further explained that even if Barbara's claim were viable, she "failed to provide . . . any appropriate evidence of damages." In that regard, the court noted that Barbara "submitted a market analysis showing a $30,000 differential between the value of the property at Victor's death and the selling price of the property[,]" alleging that the "storing of [the] [c]o-[e]xecutor's personal property diminished the property value." However, the court found that Barbara "failed to support [her] allegations with an expert opinion." In any event, the court found "no evidence of . . . wrongdoing" on the part of the co-executors "in the handling" of the East Hanover property. The court explained that "[i]f the [c]o-[e]xecutors were concerned about [Barbara] . . . wrongfully tak[ing] [d]ecedents['] personal belongings," as they claimed, "then [they] acted rightfully by removing the personal belongings first before giving [Barbara] access to the property."

Addtionally, the court found that Barbara lacked standing to litigate claims on behalf of Courtney, stating that "the only reference" to Courtney in the will was that she did "not inher[i]t." Further, the court rejected the application to remove the co-executors, finding "no evidence" of impropriety on their part. According to the court, "[t]he only issue" supporting the claim of impropriety was the "non-funding" of the "trust[]," and this issue was "withdrawn" when Barbara ceased pursuing her complaint as to Victor's estate. The court also dismissed Charles' claim to the $40,000 bequest, explaining that it could not "read into the will that he gets $40,000[,]" as there was "no evidence of any mistake." In making that determination, the court contrasted Charles' claim in his supporting certification that he "had a good relationship" with Antoinette, and "should have been" included, against his deposition testimony that "[h]e live[d] in Texas and . . . only saw [Antoinette] a few times since the [19]70's." The court did, however, grant summary judgment to Charles on the anti-lapse issue, which the Estates conceded, declaring he was a one-third residuary beneficiary of his deceased mother's interest.

Turning to the ademption issue, the court concluded that "the Smith Barney account adeemed." Relying heavily on McHugh's deposition testimony, the court found that "[i]n 2011," when Victor "discovered that the account had

risen in value to $600,000," he "expressly stated that he did not intend that amount to pass to the grandnieces and grandnephews[,]" as "those assets" constituted "the bulk of Victor's estate." According to the court, as a result, "Victor emptied the Smith Barney account and hired a financial advisor, Victor Puglio[,]" as "part of a sophisticated pre-death plan to maximize his estate for the benefit of Antoinette." The court continued that Victor then "set up an inter vivos trust and facilitated financial transactions to [the] [c]o-[e]xecutors to be used to benefit Antoinette."

Thus, the court found that these financial changes "show[ed] Victor's clear intention not to allow the grandnieces and grandnephews to receive such large amounts of money from the Estate and instead use the money towards Antoinette's care." Applying the governing legal principles, the court concluded that "[s]ince the assets from the Smith Barney account no longer existed at the time of Antoinette's death, the bequests adeemed." Further, according to the court, it was "irrelevant to the analysis whether Antoinette was privy to Victor's actions relating to the Smith Barney account" because "it would not change the fact that the assets in the account were destroyed and instead used for Antoinette's benefit." The court stressed "Antoinette never inherited a Smith Barney account because the account was destroyed prior to her death" and

"[t]hus[] Antoinette's Will could not have [bequeathed] property which [was] never part of Antoinette's Estate to begin with."

The court expressly rejected Barbara's contention "that the Smith Barney account was not destroyed, but simply changed in form since the contents were transferred to Oppenheimer & Co[,]" and rejected Barbara's reliance on "case law holding that no ademption occurred when the decedent simply moved the money to another bank, another brokerage company, or rolled the money into an IRA."  See In re Estate of Hall, 60 N.J. Super. 597 (App. Div. 1960).  According to the court,

> [t]he problem with this argument is that Victor used the money that he transferred into the Oppenheimer & Co. account to set up inter vivos trusts for the benefit of Antoinette.  It is clear from the face of the entire Will that Victor wanted to care for his sister above everything else.  This action did not just move money from one account to another, [i]t changed the very purpose and use of this money by Victor.  Although Victor did not include the intent to alter the bequests in the Codicil, it is clear from his actions that he did not intend to have his grandnieces and grandnephews split over $600,000 of Estate funds.

The court also rejected Barbara's assertion that the Estates were "estopped from claiming ademption" after McHugh previously "affirmed the bequests from the Smith Barney account were to be made to the grandnieces and grandnephews."  The court determined "it would be inequitable to apply estoppel

19

to this issue" and "completely alter the [d]ecedents' estate planning based upon . . . McHugh's [erroneous] statements alone." On February 2, 2016, the court entered two conforming orders, one granting the Estates' motion for summary judgment and dismissing Barbara's complaint with prejudice, and the other denying Barbara's cross-motion for declaratory judgment.

Thereafter, Barbara moved for reconsideration, and the Estate of Victor moved for sanctions against Barbara for frivolous litigation. On May 6, 2016, the court denied both motions. In an oral opinion, addressing the ademption issue, the court "concede[d] that [it] made a mistake in the original decision in indicating the money [from the Smith Barney account] went into a trust."[5] However, the court explained that the factual "error" was of "no consequence" because "[t]he evidence was clear" that Victor "intended" to "alter[] the purpose of that money[,]" and it was "not a matter of simply moving one account to another."

To support its motion for sanctions for filing frivolous litigation, the Estate of Victor relied on a July 8, 2013 letter sent by McHugh to Barbara's

---

[5] Instead, the record reflects that the SBT funds were held in a separate and distinct Oppenheimer account, bearing a different account number. As of September 30, 2011, the SBT account was valued at $719,132.65, while Victor's Oppenheimer brokerage account was valued at $614,793.09.

attorney pursuant to Rule 1:4-8, demanding withdrawal of her verified complaint because it

> intentional[ly] fail[ed] to accurately state the terms of [Victor's] Will; intentionally [sought] to distort the decedent's intentions stated in his Will and Codicil; [sought] a prejudicial interpretation of the Will in [Barbara's] attempt to better her and her children's stated beneficiary status in the Will; misstat[ed] the intentions/actions of both decedents, [Victor and Antoinette], related to their testamentary intentions and medical conditions, fail[ed] to disclose to the [c]ourt that by the time [Victor's] estate was finalized, [Antoinette] was deceased and you can't establish a living trust for a dead beneficiary; [and] misstate[d] and misrepresent[ed] the claimed reasons for her damages claim.

In rejecting the Estate's application, the court determined that the frivolous litigation "statute and rule" did not apply because "[t]here was a . . . good faith [basis] to start this litigation." The court noted that the sanctions sought were "extremely limited and extremely rare" and intended to apply to "baseless" cases filed "for the purpose of . . . harassment[.]" However, according to the court, although Barbara's claims were ultimately unsuccessful, she had "every right to file a claim[,]" asserting as she had that the conditions precedent to establishing "a trust" were met "based upon the fact that [Antoinette] . . . [was] suffering from dementia" and resided in "an assisted living" facility. The court continued that Barbara's advocacy regarding "[t]he Smith Barney account"

21

was also "clearly a legitimate claim[,]" as was her claim regarding the East Hanover property.

On June 27, 2016, the court awarded counsel fees and costs to the Estates' attorneys, totaling approximately $233,913, and denied Charles' request for counsel fees. While the court found the Estates' attorneys' "hourly rates" to be "reasonable" and the "[services] rendered appropriate," the court found "no legal authority" to award the fees sought by Charles' attorney and determined the services rendered did not fall within the purview of Rule 4:42-9(a)(2) or (3).

On January 26, 2017, the court denied Matthew's cross-motion to intervene in the litigation. The court found no basis to grant the application "after [Matthew] did nothing for three years [of litigation] except rely on his mother's . . . representation of him and her litigation efforts to protect his interest[.]" In a separate order entered on the same date, the court approved the final accounting of the Estates, rejecting the objection that open issues regarding the inheritance tax return precluded granting approval. The court also granted the Estates' attorneys' requests for additional counsel fees and costs totaling approximately $32,462. In granting the fees, the court "considered the lengthy . . . certifications of services submitted by both law firms" and "[found] the hourly rates to be reasonable," and "the activities that were carried out by

counsel . . . necessary[.]"  In the same order, the court "dismissed" the litigation "with prejudice[,]" as all issues were adjudicated.  These appeals followed.

On appeal, Barbara and Matthew raise the following points for our consideration:

> [POINT ONE]
>
> . . . THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT TO THE ESTATES[.]
>
> . . . .
>
> > [A]. THE TRIAL COURT ERRED IN FINDING THAT THE BROKERAGE ACCOUNT WAS SUBJECT TO ADEMPTION[.]
> >
> > [B]. THE TRIAL COURT ERRED IN FAILING TO RECONSIDER ITS DECISION REGARDING ADEMPTION[.]
> >
> > [C]. THE TRIAL COURT ERRED IN NOT ESTOPPING THE CO-EXECUTORS FROM ASSERTING THAT THE BROKERAGE ACCOUNT ADEEMED.
> >
> > > 1. THE CO-EXECUTORS ARE JUDICIALLY ESTOPPED FROM CLAIMING ADEMPTION.
> > >
> > > 2. THE CO-EXECUTORS ARE EQUITABLY ESTOPPED FROM CLAIMING ADEMPTION.

23

[POINT TWO]

. . . THE TRIAL COURT ERRED IN FAILING TO ENTER DECLARATORY JUDGMENT THAT THE GRANDNIECES/NEPHEWS ARE BENEFICIARIES OF THE BROKERAGE ACCOUNT[.]

[POINT THREE]

. . . THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT DISMISSING THE CLAIM REGARDING THE REAL PROPERTY[.]

[POINT FOUR]

. . . THE TRIAL COURT ABUSED ITS DISCRETION IN APPROVING ALL OF THE FEES SOUGHT BY THE ESTATES[.]

[POINT FIVE]

. . . MATTHEW STELLA, AS AN INTERESTED PARTY, HAD A RIGHT TO INTERVENE AND THE TRIAL COURT ERRED IN DENYING SAME[.]

     A.    MATTHEW STELLA HAD A RIGHT TO INTERVENE[.]

     B.    THE TRIAL COURT ERRED IN NOT PERMITTING INTERVENTION[.]

     C.    THE TRIAL COURT ERRED IN NOT PERMITTING MATTHEW STELLA TO REPRESENT THE CLASS[.]

Charles raises the following points in his cross-appeal:

24

POINT ONE

AN ATTORNEY HAS AN ETHICAL OBLIGATION TO HIS CLIENTS, AND TO THE BENEFICIARIES OF THE CLIENTS' ESTATES TO RETAIN AND PRESERVE ALL FILE NOTES FOR SEVEN YEARS.

POINT TWO

THE INTENTIONAL DESTRUCTION OF THE SCRIVENER'S NOTES BY AN INTERESTED PARTY RAISES A PRESUMPTION THAT THE NOTES WOULD HAVE SUPPORTED THE CLAIM OF [MORTON].

POINT THREE

WHEN THE SCRIVENER OF THE WILL HAS INTENTIONALLY DESTROYED THE FILE NOTES, IN A CASE WHICH ALLEGES AN ERROR ON HIS PART, DISMISSAL ON SUMMARY JUDGMENT IS NOT APPROPRIATE.

POINT FOUR

EVEN IF A PRESUMPTION REGARDING THE INTENTIONAL DESTRUCTION OF THE NOTES DOES NOT ARISE, SUMMARY JUDGMENT STILL SHOULD NOT HAVE BEEN GRANTED.

POINT FIVE

THE [FEDERAL TRUST[6]] CASE IS NO LONGER BINDING AUTHORITY, AS IT EXCLUDES THE USE OF EXTRINSIC EVIDENCE, AND THUS IS

---

[6] Fed. Tr. Co. v. Ost, 120 N.J. Eq. 43 (Ch. 1937), aff'd, 121 N.J. Eq. 608 (E. & A. 1937).

CONTRARY TO THE DEVELOPMENT IN SUBSEQUENT CASELAW SINCE 1937.

POINT SIX

THE EVIDENCE OF THE TESTATOR'S STATEMENTS, INCLUDING THE RELATIONSHIP AMONG THE FAMILY MEMBERS, AND THE SCRIVENER'S NOTES, OR THE ABSENCE OF THE NOTES, ARE EVIDENCE OF THE PROBABLE INTENT OF THE TESTATOR.

POINT SEVEN

THE FILING OF THE CLAIM OF [MORTON] WAS NOT BARRED BY . . . [RULE] 4:85-1, AS IT DID NOT SEEK TO SET ASIDE THE PROBATE OF THE DOCUMENT.

POINT EIGHT

IN AN ACTION TO INTERPRET A LAST WILL AND TESTAMENT, AN AWARD OF COUNSEL FEES IS APPROPRIATE WHEN THE PLAINTIFF HAS PREVAILED.

POINT NINE

THE DISMISSAL OF THE CLAIMS OF BARBARA . . . SHOULD BE UPHELD, EVEN FOR REASONS NOT RAISED BY THE SCRIVENER.

In its cross-appeal, the Estate of Victor raises the following point:

[POINT ONE]

. . . THE TRIAL COURT'S RULING DENYING SANCTIONS AGAINST BARBARA STELLA FOR

FRIVOLOUS LITIGATION SHOULD BE REVERSED[.]

## II.

In reverse order, we first address the Estate of Victor's cross-appeal. We review a trial court's decision on a motion for frivolous lawsuit sanctions under "an abuse of discretion standard[,]" United Hearts, L.L.C. v. Zahabian, 407 N.J. Super. 379, 390 (App. Div. 2009) (citing Masone v. Levine, 382 N.J. Super. 181, 193 (App. Div. 2005)), and will only reverse such a decision if "it 'was not premised upon consideration of all relevant factors, was based upon consideration of irrelevant or inappropriate factors, or amounts to a clear error in judgment.'" McDaniel v. Man Wai Lee, 419 N.J. Super. 482, 498 (App. Div. 2011) (quoting Masone, 382 N.J. Super. at 193).

Rule 1:4-8 and N.J.S.A. 2A:15-59.1 authorize sanctions and reasonable attorney's fees against parties for bringing frivolous litigation before the court. N.J.S.A. 2A:15-59.1(a) provides that a prevailing party of "a civil action, either [a] plaintiff or defendant, against any other party may be awarded all reasonable litigation costs and reasonable attorney fees, if the judge finds at any time during the proceedings or upon judgment that a complaint, counterclaim, cross-claim or defense of the nonprevailing person was frivolous." To find a complaint frivolous:

> [T]he judge shall find on the basis of the pleadings, discovery, or the evidence presented that either: (1) The complaint . . . was commenced, used or continued in bad faith, solely for the purpose of harassment, delay or malicious injury; or (2) The nonprevailing party knew, or should have known, that the complaint, . . . was without any reasonable basis in law or equity and could not be supported by a good faith argument for an extension, modification or reversal of existing law.
>
> [N.J.S.A. 2A:15-59.1(b).]

"For purposes of imposing sanctions under Rule 1:4-8, an assertion is deemed 'frivolous' when 'no rational argument can be advanced in its support, or it is not supported by any credible evidence, or it is completely untenable.'" United Hearts, 407 N.J. Super. at 389 (quoting First Atl. Fed. Credit Union v. Perez, 391 N.J. Super. 419, 432 (App. Div. 2007)). Therefore, "[w]here a party has reasonable and good faith belief in the merit of the cause," a motion for sanctions will be denied. Perez, 391 N.J. Super. at 432. Indeed, "[t]he nature of conduct warranting sanction under Rule 1:4-8 has been strictly construed," and "'the term "frivolous" should be given a restrictive interpretation' to avoid limiting access to the court system." Id. at 432-33 (quoting McKeown-Brand v. Trump Castle Hotel & Casino, 132 N.J. 546, 561-62 (1993)).

Here, we discern no abuse of discretion in the court's denial of the Estate's motion for sanctions. We agree with the court that while Barbara's claims were

largely unsuccessful, they were brought in good faith and were not frivolous under N.J.S.A. 2A:15-59.1 or Rule 1:4-8(a). Moreover, "a pleading will not be considered frivolous for purposes of imposing sanctions under Rule 1:4-8 unless the pleading as a whole is frivolous[,]" United Hearts, 407 N.J. Super. at 394, "'or of a harassing nature[,]'" id. at 390 (quoting Iannone v. McHale, 245 N.J. Super. 17, 32 (App. Div. 1990)), neither of which applies here.

## III.

We next address Charles' claims. Although Charles delineates several different point headings in his merits brief, he essentially contends that the court erred by granting summary judgment to the co-executors on the $40,000 bequest, and denying his motion for counsel fees. Charles contends he should have been included in the bequest because there was no "specific exclusion" and the "omission of [his] name was an error in the preparation of the [will]." Charles continues that a dismissal on summary judgment was not appropriate where, as here, "the scrivener intentionally destroyed document[s] in violation of his obligation to retain and preserve them, and the documents might have favored [Charles]." Further, Charles argues that the court erred in relying on Ost, 120 N.J. Eq. at 48-49, because it is distinguishable and "has essentially been overruled" by statute and case law "concerning the 'doctrine of probable intent.'"

Finally, Charles asserts the court erred in denying his request for counsel fees "even for his successful claim on the anti-lapse statute."

A.

We first address the summary judgment ruling. We review "the trial court's grant of summary judgment de novo under the same standard as the trial court." Templo Fuente De Vida Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, 224 N.J. 189, 199 (2016) (citing Mem'l Props., LLC v. Zurich Am. Ins. Co., 210 N.J. 512, 524 (2012)). That standard is well-settled.

> [I]f the evidence of record—the pleadings, depositions, answers to interrogatories, and affidavits—"together with all legitimate inferences therefrom favoring the non-moving party, would require submission of the issue to the trier of fact," then the trial court must deny the motion. On the other hand, when no genuine issue of material fact is at issue and the moving party is entitled to a judgment as a matter of law, summary judgment must be granted.
>
> [Steinberg v. Sahara Sam's Oasis, LLC, 226 N.J. 344, 366 (2016) (quoting R. 4:46-2(c)); see Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995).]

"When no issue of fact exists, and only a question of law remains," we "afford[] no special deference to the legal determinations of the trial court." Templo Fuente, 224 N.J. at 199 (citing Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995)). Thus, "[t]o defeat a motion for

summary judgment, the opponent must 'come forward with evidence' that creates a genuine issue of material fact." Cortez v. Gindhart, 435 N.J. Super. 589, 605 (App. Div. 2014) (quoting Horizon Blue Cross Blue Shield of N.J. v. State, 425 N.J. Super. 1, 32 (App. Div. 2012)). However, "conclusory and self-serving assertions by one of the parties are insufficient to overcome the motion," Puder v. Buechel, 183 N.J. 428, 440-41 (2005) (citing Martin v. Rutgers Cas. Ins. Co., 346 N.J. Super. 320, 323 (App. Div. 2002)), and the opponent must "do more than 'point[] to any fact in dispute' in order to defeat summary judgment." Globe Motor Co. v. Igdalev, 225 N.J. 469, 479 (2016) (alteration in original) (emphasis omitted) (quoting Brill, 142 N.J. at 529).

In other words, disputes about facts that are "immaterial or of an insubstantial nature" provide no basis to deny the moving party summary judgment. Id. at 480 (quoting Brill, 142 N.J. at 529). Rather, "[a]n issue of fact is genuine only if, considering the burden of persuasion at trial, the evidence submitted by the parties on the motion, together with all legitimate inferences therefrom favoring the non-moving party, would require submission of the issue to the trier of fact." R. 4:46-2(c). "The practical effect of [Rule 4:46-2(c)] is that neither the motion court nor an appellate court can ignore the elements of

the cause of action or the evidential standard governing the cause of action." Bhagat v. Bhagat, 217 N.J. 22, 38 (2014).

Pertinent to the actions underlying these appeals, "[t]he court's primary goal in interpreting a [will] is to fulfill the [testator's] intent[,]" In re Tr. of Nelson, 454 N.J. Super. 151, 158 (App. Div. 2018), and a "preponderance-of-the-evidence standard of proof applies to interpretation[.]" Id. at 160. "[T]he goal always is the ascertainment of the testator's intent and it is not to be thwarted by unduly stressing 'the literal meaning' of his words." Id. at 158 (alteration in original) (quoting Fidelity Union Tr. Co. v. Robert, 36 N.J. 561, 565 (1962)). Notably, "in ascertaining intent," the "focus" is "really" on the testator's "'probable intent' because 'it is impossible to determine with absolute certainty [the testator's] actual subjective intent.'" Ibid. (alteration in original) (quoting Morristown Tr. Co. v. McCann, 19 N.J. 568, 572 (1955)).

"In essence, the doctrine of probable intent is a rule of construction or interpretation[,]" In re Estate of Flood, 417 N.J. Super. 378, 382 (App. Div. 2010), and "represents . . . a 'broader and more liberal approach to will construction' than the prior insistence on formalistic results." Id. at 381 (quoting In re Estate of Burke, 48 N.J. 50, 63 (1966)). While the doctrine "does not permit a court to 'conjure up an interpretation or derive a missing testamentary

provision out of whole cloth,'" Nelson, 454 N.J. Super. at 158 (quoting Engle v.

Siegel, 74 N.J. 287, 291 (1977)), it "'may, on the basis of the entire will,

competent extrinsic evidence and common human impulses strive reasonably to

ascertain and carry out what the testator probably intended . . . .'" Id. at 159

(quoting Burke, 48 N.J. at 64).

Thus, "[t]he doctrine permits the reformation of a will in light of a

testator's probable intent by 'searching out the probable meaning intended by the

words and phrases in the will[,]'"[7] Flood, 417 N.J. Super. at 381 (quoting Engle,

74 N.J. at 291), and offering "extrinsic evidence . . . not only to show an

ambiguity in a will but also, if an ambiguity exists, 'to shed light on the testator's

actual intent.'"  Ibid. (quoting Wilson v. Flowers, 58 N.J. 250, 263 (1971)).

Indeed, as codified by statute,

> [t]he intention of a testator as expressed in his [or her]
> will controls the legal effect of his [or her] dispositions,
> and the rules of construction expressed in N.J.S.[A.]
> 3B:3-34 through N.J.S.[A.] 3B:3-48 shall apply unless
> the probable intention of the testator, as indicated by
> the will and relevant circumstances, is contrary.
>
> [N.J.S.A. 3B:3-33.1(a).]

---

[7] While "[t]he preponderance-of-the-evidence standard of proof applies to interpretation[,] . . . the more rigorous clear-and-convincing standard of proof applies to reformation." Nelson, 454 N.J. Super. at 160.

A-2847-16T4

Here, paragraph B of article three of Antoinette's will bequeathed "[t]he sum of Forty Thousand . . . dollars to each of my following nieces and nephews, Joanne Cannici, Stephen Cannici, Felicia Alfieri Feldman, Linda Alfieri Willman, Brenda Ann Morton, [a]nd Barbara Ann Morton Stella, per stirpes and not per capita." (Emphasis added). The unambiguous language of the will expressly excluded Charles by limiting the bequest to specified nieces and nephews. Charles asserts that McHugh's destruction of the scrivener's notes in 2011 creates an inference in his favor, and that a fact finder could have found that Antoinette did not intend to treat him differently from the other nieces and nephews. However, these "[b]are conclusory assertions, without factual support in the record," Horizon, 425 N.J. Super. at 32 (citing Brae Asset Fund, L.P. v. Newman, 327 N.J. Super. 129, 134 (App. Div. 1999)), and "unsubstantiated inferences and feelings[,]" Oakley v. Wianecki, 345 N.J. Super. 194, 201 (App. Div. 2001), are insufficient to defeat summary judgment. Thus, we agree with the court that Charles was not bequeathed $40,000 under the unambiguous terms of Antoinette's will, and we discern no basis to reverse the grant of summary judgment to her Estate.[8] To rule otherwise would "derive a missing testamentary

---

[8] Charles challenges the court's reliance on Ost, which held that a court must assume it was the testator's intent to omit a nephew from a bequest where, as

provision out of whole cloth[.]" <u>Nelson</u>, 454 N.J. Super. at 160 (quoting <u>Engle</u>, 74 N.J. at 291).

B.

Turning to the court's denial of Charles' request for an award of counsel fees, parties seeking counsel fees bear the burden of proving they are entitled to an award and that the fees sought are reasonable. <u>Green v. Morgan Props.</u>, 215 N.J. 431, 455 (2013). "A prevailing party can recover counsel fees if expressly allowed by statute, court rule, or contract." <u>Empower Our Neighborhoods v. Guadagno</u>, 453 N.J. Super. 565, 579 (App. Div. 2018).

<u>Rule</u> 4:42-9(a)(2), pertaining to "a fund in court[,]" permits "[a] fiduciary" to "make payments . . . for legal services rendered out of a fund entrusted to the fiduciary for administration, subject to approval . . . by the court upon settlement of the account." "'Fund in court' has been defined as 'where it is in the hands of a fiduciary who is a party before the court and when it is within the court's jurisdictional authority to deal with it.'" <u>In re Prob. of Alleged Will of Landsman</u>, 319 N.J. Super. 252, 272 (App. Div. 1999) (quoting <u>In re Estate of</u>

---

here, other nieces and nephews were specifically named. 120 N.J. Eq. at 48-49. Charles also questions the court's reliance on <u>Rule</u> 4:85-1, permitting an aggrieved person to file a complaint within specified time frames when "a will has been probated . . . ." However, there is no indication in the record that the court relied on either.

Thornton, 169 N.J. Super. 360, 369 (App. Div. 1979)). "In order for an attorney to be entitled to compensation for his services from a 'fund in court' he must have aided directly in creating, preserving or protecting the fund. He is not entitled to such an award if his client sues merely for his own interest or benefit." Shilowitz v. Shilowitz, 115 N.J. Super. 165, 188 (Ch. Div. 1971), modified, 119 N.J. Super. 311 (App. Div. 1972) (citation omitted).

Additionally, Rule 4:42-9(a)(3) specifically permits the award of counsel fees in probate actions. "If probate is granted, and it shall appear that the contestant had reasonable cause for contesting the validity of the will or codicil, the court may make an allowance to the proponent and the contestant, to be paid out of the estate." Ibid. (emphasis added). In accordance with this rule, courts may allow counsel fees to both the proponent and contestant in a will dispute "'[e]xcept in a weak or meretricious case.'" In re Prob. of Will & Codicil of Macool, 416 N.J. Super. 298, 313 (App. Div. 2010) (alteration in original) (quoting In re Reisdorf, 80 N.J. 319, 326 (1979)).

However, whether to award counsel fees and "[t]he extent of such awards rests within the sound discretion of the trial [court,]" Empower Our Neighborhoods, 453 N.J. Super. at 579, and "fee determinations by trial courts will be disturbed only on the rarest of occasions, and then only because of a

36

clear abuse of discretion." Packard-Bamberger & Co. v. Collier, 167 N.J. 427, 444 (2001) (quoting Rendine v. Pantzer, 141 N.J. 292, 317 (1995)). An abuse of discretion in the award of counsel fees may be demonstrated "if the discretionary act was not premised upon consideration of all relevant factors, was based upon consideration of irrelevant or inappropriate factors, or amounts to a clear error in judgment." Masone, 382 N.J. Super. at 193 (citing Flagg v. Essex Cty. Prosecutor, 171 N.J. 561, 571 (2002)).

Here, we discern no abuse of discretion in the court's denial of Charles' request for counsel fees in light of the fact that Charles' pursuit of the $40,000 bequest was unsuccessful, and the Estate conceded Charles was a beneficiary under the anti-lapse statute, obviating the need for litigation. Given the "considerable latitude" afforded courts "in resolving fee applications," Grow Co., Inc. v. Chokshi, 424 N.J. Super. 357, 367 (App. Div. 2012), we see no reason to intervene.

## IV.

We now turn our attention to Matthew's contention that the court erred by denying his application to intervene as of right, under Rule 4:33-1, or permissively, pursuant to Rule 4:33-2. To satisfy Rule 4:33-1's requirements to intervene as of right, a moving party must:

(1) claim "an interest relating to the property or transaction which is the subject of the transaction," (2) show [that the movant] is "so situated that the disposition of the action may as a practical matter impair or impede its ability to protect that interest," (3) demonstrate that the "[movant's] interest" is not "adequately represented by existing parties," and (4) make a "timely" application to intervene.

[Am. Civil Liberties Union of N.J., Inc. v. Cty. of Hudson, 352 N.J. Super. 44, 67 (App. Div. 2002) (alterations in original) (quoting Meehan v. K.D. Partners, L.P., 317 N.J. Super. 563, 568 (App. Div. 1998)).]

"As the rule is not discretionary, a court must approve an application for intervention as of right if the four criteria are satisfied." Meehan, 317 N.J. Super. at 568.

Alternatively, under Rule 4:33-2, "[u]pon timely application[,] anyone may be permitted to intervene in an action if the claim or defense and the main action have a question of law or fact in common." "In exercising its discretion[,] the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties." Ibid. Because the decision "vests considerable discretion in the trial court[,]" Evesham Twp. Zoning Bd. of Adjustment v. Evesham Twp. Council, 86 N.J. 295, 299 (1981), we review the trial court's adjudication of a permissive intervention motion under an abuse of

A-2847-16T4

discretion standard.  See City of Asbury Park v. Asbury Park Towers, 388 N.J. Super. 1, 12 (App. Div. 2006).

Here, the court denied Matthew's motion to intervene because it was untimely.  The litigation regarding the brokerage account had been ongoing for over three years, and Matthew failed to move to intervene during that time period.  It was only when the Estates moved for the court to approve the final accounting that Matthew filed a cross-motion to intervene.  We have instructed that "[o]n the issue of timeliness," the court must "consider the purpose of the intervention motion in relation to the stage in the action when the motion was made."  Chesterbrooke Ltd. P'ship v. Planning Bd. of Tp. of Chester, 237 N.J. Super. 118, 125 (App. Div. 1998).  "For example, if intervention is sought only for the limited purpose of taking an appeal, the only 'prejudice to those already parties in the case' from granting intervention is the inherent 'delay' necessarily involved in opposing the intervenor's appeal."  Ibid. (quoting United States v. Am. Tel. & Tel. Co., 642 F.2d 1285, 1294-95 (D.C. Cir. 1980)).

Here, the court acknowledged that given the Estate's challenge to "Barbara's standing to pursue [an] appeal[,]" Matthew sought to intervene "in order to preserve the right to appeal."  However, there had been no determination that Barbara had no standing to pursue an appeal, and the court rejected the

Estate's contention that the court had previously made that determination. According to the court, there was "no order . . . ever entered to that effect," and such "a determination" would have had to be "reduced to an order" to be binding. Thus, the court concluded there was "no reason for a change" in "the status quo" "at this point" by permitting Matthew's intervention. We agree with the court's determination.

More problematic, however, is the dearth of evidence in the record demonstrating that Matthew complied with the procedural requirements of Rule 4:33-3, which requires "[a] person desiring to intervene" to "serve on all parties a motion to intervene stating the grounds therefor and accompanied by a pleading setting forth the claim or defense for which intervention is sought along with a Case Information Statement pursuant to [Rule] 4:5-1(b)(1)." Thus, we are also convinced that Matthew's failure to meet the procedural requirements of Rule 4:33-3 was fatal to his application.

V.

Finally, we address Barbara's claims in turn.

A.

Turning first to her challenge of the award of counsel fees, Barbara argues the court "abuse[d] its discretion" by "not reducing the amount of fees sought

40

by the estates' counsel." Barbara posits "[t]he majority of the fees incurred in Antoinette's estate were as a direct result of the co-executors' change in position with respect to the disposition of the brokerage account and the time and effort to prevent the disclosure of relevant information." Additionally, Barbara asserts that "[t]he fees associated with the filing of the inheritance tax return in Antoinette's estate should be disallowed" because "[t]he return had to be amended" as a result of errors, and the co-executors "failed to disclaim assets from the Victor estate, which would have resulted in an overall tax savings to the estates." She also contends the certifications submitted by counsel contained incomplete, duplicative, and erroneous entries.

While Rule 4:42-9(a)(3) permits the award of counsel fees "out of the estate" in "a probate action," Rule 4:42-9(b) specifies that "all applications for the allowance of fees shall be supported by an affidavit of services addressing the factors enumerated by RPC 1.5(a)[,]" and "shall also include a recitation of other factors pertinent in the evaluation of the services rendered, the amount of the allowance applied for, and an itemization of disbursements for which reimbursement is sought." RPC 1.5(a) details the factors a court is required to

consider in assessing the reasonableness of attorney's fees.[9] After analyzing the relevant factors, a court must then "state its reasons on the record for awarding a particular fee . . . ." City of Englewood v. Exxon Mobile Corp., 406 N.J. Super. 110, 125 (App. Div. 2009) (quoting Furst v. Einstein Moomjy, Inc., 182 N.J. 1, 22 (2004)).

_____

[9] The factors to be considered include the following:

> (1)  the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;
>
> (2)  the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;
>
> (3)  the fee customarily charged in the locality for similar legal services;
>
> (4)  the amount involved and the results obtained;
>
> (5)  the time limitations imposed by the client or by the circumstances;
>
> (6)  the nature and length of the professional relationship with the client;
>
> (7)  the experience, reputation, and ability of the lawyer or lawyers performing the services;
>
> (8)  whether the fee is fixed or contingent.
>
> [RPC 1.5(a).]

Here, McHugh and Cathyanne Pisciotta, as counsel for the Estates, submitted separate certifications of services in compliance with Rule 4:42-9(b)'s requirements. The certifications delineated the relevant RPC 1.5(a) factors, including the attorneys' experience, hourly rates, time expended, and work performed. After analyzing the pertinent factors, the court determined the fees were reasonable. Given the length, complexity, and litigious history of the case, we discern no abuse of discretion in the court's determination, and no reason to disturb the award.

B.

Next, we address Barbara's contention that the court erred when it dismissed her complaint for damages arising from the sale of the East Hanover property. Because this issue was resolved by summary judgment, we review the court's decision de novo. Templo Fuente, 224 N.J. at 199. Barbara argues the "court erred in finding that [her] claims were moot" because the house had sold by the time an action was filed and she had received one-sixth of the sale proceeds. According to Barbara, she was entitled to "legal damages for the lack of access during the co-executors' wrongful sole possession" of the property calculated by "the imputed rental value for use and occupancy." Additionally, she asserts she was entitled to "the difference between the lower sales price and

43

the appraised date of death value of the property," or, more specifically, $5,000, representing "one-sixth" of "$30,000." Barbara also contends the court erred by finding "no wrongdoing by the agents of the estates[,]" and by "failing to hold the co-executors accountable for usurping a co-owner's rights[,]" and "using the property to store their own personalty."

The court analyzed Barbara's claim as a legally cognizable claim for ouster. An ouster occurs "where one cotenant . . . remains in possession of a one-family house which is not susceptible of joint occupancy, and refuses to accede to plaintiff's demands for access to the property[.]" Newman v. Chase, 70 N.J. 254, 267 (1976). Where "'an ouster or exclusion'" occurs, "the excluded cotenant may recover the reasonable rental value of the portion of the property so occupied." Capital Fin. Co. of Del. Valley, Inc. v. Asterbadi, 398 N.J. Super. 299, 312 (App. Div. 2008) (quoting Lohmann v. Lohmann, 50 N.J. Super. 37, 68 (App. Div. 1958)). When an ouster occurs, "'but the ousted cotenant receives an accounting based on the value of the use and occupation by the cotenant in possession, equity requires that appropriate payments made by the cotenant in possession be credited in calculating what is due [to] the cotenant out of possession.'" Ibid. (quoting Newman, 70 N.J. at 267-68).

Here, the parties were not co-tenants. Thus, we question the applicability of an ouster claim. On the other hand, under N.J.S.A. 2A:35-1, "[a]ny person claiming the right of possession of real property in the possession of another, or claiming title to such real property, shall be entitled to have his [or her] rights determined in an action in the Superior Court." "When a landowner establishes his or her entitlement to possession of or title to the realty," then a landowner-plaintiff "'shall be entitled to recover from the defendant any and all incidental damages, including mesne profits, and the full value of the use and occupation of the premises for the time, not exceeding 6 years, before the commencement of the action, during which the defendant was in possession thereof.'" J & M Land Co. v. First Union Nat'l Bank ex rel. Meyer, 166 N.J. 493, 506 (2001) (quoting N.J.S.A. 2A:35-2).

Similarly, under N.J.S.A. 2A:39-5,

> A person taking possession of real property, without the consent of the owner or without color of title, and willfully and without force holding or detaining the same after demand and written notice given for the delivery of the possession thereof, by the owner or person entitled to possession or right to possession shall be guilty of an unlawful detainer.

A successful plaintiff in an unlawful detainer action "shall be entitled to possession of the real property[,]" if appropriate, and "shall recover all damages

proximately caused by the unlawful entry and detainer including court costs and reasonable attorney's fees." N.J.S.A. 2A:39-8.

Here, upon Victor's death, Barbara became a one-sixth owner of the East Hanover property because she held a remainder interest in his life estate. Barbara filed a timely complaint against the Victor Estate, seeking damages incurred as a result of the co-executors' possession of the East Hanover property and denial of her claim for access to the property until over one year after Victor's death. The co-executors claimed they secured the premises to protect Victor's and Antoinette's personal belongings from Barbara's pilfering. Nonetheless, Barbara was permitted "to assert a claim for whatever damages the facts may lawfully warrant, unrestrained by common law pleading or nomenclature." Marder v. Realty Constr. Co., 43 N.J. 508, 511 (1964). To that end, Barbara sought $5,000, representing one-sixth of the difference between the sale price and the value of the property on the date of Victor's death, and an unspecified amount, representing the value of the co-executors' use of the premises. As the court found, however, the former was unsupported by "an expert opinion," and the latter was speculative at best, particularly given the co-executors' "fiduciary duty to protect estate assets." Accordingly, we agree with the court's decision to grant summary judgment and dismiss Barbara's claim

based on her failure to support her claim for damages, albeit predicated upon a different cause of action. See Isko v. Planning Bd. of Livingston, 51 N.J. 162, 175 (1968) ("[I]f the order of [a trial court] is valid, the fact that it was predicated upon an incorrect basis will not stand in the way of its affirmance.").

## C.

Next, we turn to Barbara's contention that the trial court erred in denying her cross-motion for declaratory relief, in order to declare that the class of grandnieces and grandnephews are beneficiaries of the brokerage account. Because Barbara failed to meet certain procedural requirements, her application was properly rejected.

Declaratory relief pursuant to the Declaratory Judgment Act (DJA), N.J.S.A. 2A:16-50 to -62, is an equitable remedy "to provide a means by which rights and obligations may be resolved in a case . . . ." State v. Eatontown Borough, 366 N.J. Super. 626, 636-37 (App. Div. 2004). "Generally, it rests in the sound discretion of the trial court whether declaratory relief under the Act should be granted." Id. at 637. Thus, we review the trial court's denial under an abuse of discretion standard. Ibid.

The DJA specifies that:

> A person interested as or through an executor, . . .
> trustee, . . . or other fiduciary, . . . devisee, legatee, [or]

heir . . . in the administration of a trust or the estate of a decedent . . . may have a declaration of rights or legal relations in respect thereto, to:

a. Ascertain any class of . . . devisees, legatees, heirs . . . or others; or

b. Direct the executor . . . or other fiduciary to do or abstain from doing any particular act in his fiduciary capacity; or

c. Determine any question arising in the administration of the estate, [or] trust . . . including the construction of wills and other writings.

[N.J.S.A. 2A:16-55.]

Additionally, N.J.S.A. 2A:16-53 provides that "[a] person interested under a deed, [or] will . . . may have determined any question of construction or validity arising under the instrument . . . and obtain a declaration of rights, status or other legal relations thereunder."

It is undisputed that in addition to being a legatee of a $40,000 bequest, Barbara is a residuary beneficiary under Antoinette's will since, like her brother Charles, she would take in place of her mother under the anti-lapse statute, N.J.S.A. 3B:3-35. Barbara is also the parent of Matthew and Christina Stella, who are the grandchildren of Anna Marie Alfieri Morton and the grandnephew and grandniece, respectively, of Victor and Antoinette. Because Christina is under the age of twenty-five, Barbara would be the trustee of any assets passing

to her daughter under Antoinette's will. Thus, Barbara qualifies as an interested person entitled to bring a declaratory judgment action to obtain a declaration of rights and construction of the will.

However, "[w]hen declaratory relief is sought, all persons having or claiming any interest which would be affected by the declaration shall be made parties to the proceeding." Gotlib v. Gotlib, 399 N.J. Super. 295, 313 (App. Div. 2008) (quoting N.J.S.A. 2A:16-56). Indeed, a court "cannot adjudicate the rights of parties who are not before the court[,]" ibid., and "[a] non-party 'remains unaffected by any such judgment.'" Id. at 314 (quoting Tal v. Franklin Mut. Ins. Co., 172 N.J. Super. 112, 116 (App. Div. 1980)). See N.J.S.A. 2A:16-57. Here, Barbara sought declaratory relief in a cross-motion, rather than a complaint, and failed to join all interested parties, including other residuary beneficiaries, grandnieces and grandnephews, as required under N.J.S.A. 2A:16-56. While the former is not fatal to her application, the latter is.

The stated purpose of the DJA "is to settle and afford relief from uncertainty and insecurity with respect to rights, status and other legal relations." N.J.S.A. 2A:16-51. That purpose cannot be achieved unless all parties having an interest in the subject matter are joined. Indeed, "[t]he court may refuse to render or enter a declaratory judgment, when, if rendered or

A-2847-16T4

entered, it would not terminate the uncertainty or controversy giving rise to the proceeding." N.J.S.A. 2A:16-61. Therefore, we discern no abuse of discretion in the court's dismissal of Barbara's claim for declaratory relief. See Garnick v. Serewitch, 39 N.J. Super. 486, 500 (Ch. Div. 1956) (holding that joining interested parties necessary to the litigation is a prerequisite to bringing a declaratory judgment action).

D.

Finally, we address Barbara's contention that the court erred in granting the Estate of Antoinette summary judgment on the ademption issue. Having considered the arguments and applicable law, we are satisfied that the bequest did not adeem as a matter of law, and the court erred in ruling otherwise.

In New Jersey,

> [t]he test of ademption of a specific legacy . . . is whether the subject is "lost, destroyed, or subsequently disposed of by testator, or so altered in form, by testator's subsequent acts, as to indicate a change of testamentary intent on his [or her] part. Conversely, if the subject, although somewhat changed in form, be not sufficiently changed to indicate change of testamentary intent, there is no ademption."
>
> [Arenofsky v. Arenofsky, 29 N.J. Super. 209, 213 (App. Div. 1954) (quoting Chase Nat'l Bank v. Deichmiller, 107 N.J. Eq. 379, 382 (Ch. 1930)).]

In Arenofsky, we held that the testator's bequest of a partnership interest did not adeem even though the partnership was converted into a corporation prior to the testator's death. Id. at 213-14. There, we reversed the trial court's determination "that the effect of the creation of the corporation and the transfer to it of the decedent's equal share of the partnership and the receipt in return therefor of shares of stock was to adeem the bequest of the partnership interest." Id. at 213. We found "the testator's interest in the corporation remained precisely the same as it had been in the partnership[,]" "[t]he alteration was in form only[,]" ibid., and there was "no substantial evidence in the surrounding circumstances . . . which demonstrate[d] an intention on [the testator's] part to consider his interest in the corporation as different from that in the partnership." Id. at 213-14. We determined "[h]is share was in the business, and the form it took on under the facts presented" was "immaterial." Id. at 214.

Likewise, in Hall, we reversed the trial court's determination that "a specific bequest by will of certain bank accounts . . . adeemed by the transfer of the moneys from four banks named in the will, during the testator's lifetime, to another bank and a savings and loan association." 60 N.J. Super. at 598. There, the testator transferred the funds because he moved from Rochester, New York, to Maplewood, New Jersey, and began using local New Jersey banks. Id. at 599-

51                                                                    A-2847-16T4

600. The total sum of money in the four New York bank accounts was directly traceable to the sum of money transferred into the two New Jersey accounts. Id. at 600. We posited that

> [t]he precise question . . . [was] whether the intent of the testator was to so delimit and confine the subject matter of the specific bequests . . . that if the money therein should be transferred before his death to other depositaries purely for his own custodial convenience, as was obviously here the case, the bequest was therefore necessarily revoked because the money was no longer in "the form of bank accounts" in the specific banks named in the will.
>
> [Id. at 600-01.]

We noted there was "nothing to indicate that the estate of the testator was substantially different in size or content when the will was drawn from when he died." Id. at 602. Focusing on the testator's intent, we explained:

> The testator intended to bequeath, not the particular funds in the Rochester banks, but something having a value roughly equal, or likely to be substantially equal at his death, to that amount of money. The location named in the will was the location of the funds when the will was made, and this location identified the moneys, but this was not a vital term of the bequest. The change in place of deposit did not affect the substance of the gift.
>
> [Id. at 603.]

A-2847-16T4

See also White v. White, 105 N.J. Super. 184, 187 (Ch. Div. 1969) (finding "probable intent of the testator is the determining factor" in assessing ademption); Wyckoff v. YWCA, 37 N.J. Super. 274, 278 (Ch. Div. 1955) ("The intention of the testator . . . is involved only when his actions with reference to the subject matter of the bequest give rise to the inquiry as to whether there has been an ademption.").

Here, the court framed the issue as whether Victor's transfer of the assets in his Smith Barney account to Oppenheimer amounted to an ademption of those funds. However, because Victor's bequest to Antoinette was a general residuary bequest, rather than a specific bequest, it was not subject to ademption. "A general legacy is defined as a bequest of personal property payable out of the general assets of the testator's estate rather than from specific property included therein." Busch v. Plews, 12 N.J. 352, 356 (1953). On the other hand, "[a] specific legacy is defined as a bequest of personal property in specie and not payable from other assets of the estate." Ibid. (citing Camden Tr. Co. v. Cramer, 136 N.J. Eq. 261, 270 (Ch. 1945)). Only "[s]pecific legacies are subject to ademption; and it is the settled rule of construction that a legacy will not be deemed specific unless the testator has explicitly indicated such to have been his intention." Cramer, 136 N.J. Eq. at 270; see also Busch, 12 N.J. at 356.

Because specific legacies "are subject to ademption with consequent frustration of the testator's donative purpose, courts lean against construing legacies as specific." Busch, 12 N.J. at 356 (citing Cramer, 136 N.J. Eq. at 270).

Here, because Victor predeceased Antoinette, the governing provision of Victor's will reads as follows:

> I give, devise[,] and bequeath to my beloved sister, ANTOINETTE ELEANOR ALFIERI, absolutely and forever, all of the remainder of my property, real, personal, and mixed, of whatsoever kind and wheresoever situated, which I may own, possess[,] or be entitled to at the time of my death, or over which I may have any power of appointment or disposition . . . .

The language clearly shows that the bequest to Antoinette was a general rather than a specific legacy. The will made no mention of specific assets or listed specific property Antoinette would inherit. "If the subject-matter is not sufficiently individuated, the legacy is treated as general . . . ." Cramer, 136 N.J. Eq. at 270. As a result, contrary to the court's conclusion, Antoinette did, in fact, inherit the brokerage account and was free to dispose of the funds as she wished.

Because paragraph A of the third article of Antoinette's will provided a bequest "in equal shares" to specified grandnephews and grandnieces of "[t]he balance of the pre-death shareholdings" of Victor's "brokerage account at Smith

Barney," the issue then becomes whether this specific bequest in Antoinette's will ademed. Although there was evidence from McHugh's deposition testimony of Victor's intention to disinherit his grandnieces and grandnephews, in interpreting Antoinette's will, the analysis focuses on Antoinette's "probable intent" after inheriting Victor's brokerage account. In re Estate of Payne, 186 N.J. 324, 335 (2006). In that regard, "in determining the testator's subjective intent, 'courts will give primary emphasis to [her] dominant plan and purpose as they appear from the entirety of [her] will when read and considered in the light of the surrounding facts and circumstances." Ibid. (quoting Robert, 36 N.J. at 564-65).

When Victor moved his assets from Smith Barney to Oppenheimer, "although [the assets] somewhat changed in form," those assets were not "lost, destroyed, or subsequently disposed of by" Antoinette. Arenofsky, 29 N.J. Super. at 213. Indeed, the assets in the Oppenheimer account, consisting of stocks of various corporations, were virtually identical to the assets transferred from the Smith Barney account. Neither is there any evidence that those assets were "so altered in form" by Antoinette's subsequent acts "as to indicate a change of testamentary intent on [her] part." Ibid. Further, in light of the surrounding facts and circumstances, there is no evidence demonstrating a plan

or purpose from the entirety of Antoinette's will that she intended to disinherit her grandnieces and grandnephews. Pertinent to that determination, in July 2011, when Antoinette executed a codicil specifically excluding Courtney from her will, there was no mention of the brokerage account or of disinheriting any other grandniece or grandnephew. In these circumstances, Victor's words and actions prior to Antoinette's acquisition of his assets are of no consequence in ascertaining Antoinette's testamentary intent.

In sum, because the Smith Barney brokerage account did not adeem, and Antoinette bequeathed those assets, valued at over $600,000 at the time of her death, to specified grandnieces and grandnephews, the court erred as a matter of law in granting the Estate of Antoinette summary judgment. Based on our decision, we need not consider Barbara's remaining arguments that the court erred in denying reconsideration and declining to judicially and equitably estop the Estate from arguing ademption. Accordingly, the court's order granting the Estate summary judgment on the ademption issue is reversed. We affirm in all other respects. To the extent we have not specifically addressed a particular argument, it is because either our disposition makes it unnecessary or the argument was without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.  We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2847-16T4